UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

               Plaintiff,

               v.

STATE OF NEW YORK; KATHLEEN HOCHUL,
Governor of New York, in her Official Capacity;
LETITIA A. JAMES, Attorney General of New York, in
her Official Capacity; MARK J. F. SCHROEDER,
Commissioner of the New York State Department of
Motor Vehicles, in his Official Capacity,

               Defendants.

No. 25-cv-205 (AMN) (MJK)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
*New York State Attorney General*
28 Liberty Street
New York, New York 10005

LINDA FANG
  *Special Litigation Counsel*
ALEX POWHIDA
  *Special Litigation Counsel*
     *of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF THE CASE.................................................................................... 3

    I.      STATUTORY AND REGULATORY FRAMEWORK ........................................ 3

    II.     PRIOR PROCEEDINGS AND PROCEDURAL HISTORY ................................. 6

STANDARD OF REVIEW ........................................................................................ 7

ARGUMENT ............................................................................................................. 7

    I.      THE ACT IS NOT PREEMPTED BY FEDERAL LAW .................................... 7

         A.    The Act Is Presumed Valid Because It Regulates on Matters of Traditional State Interest ................................................................................ 8

         B.    The Confidentiality, Notification, and Certification Provisions Further the Statutory Scheme.......................................................................... 10

         C.    The Challenged Portions of the Act Do Not Conflict with Federal Law ................ 13

             1.    The Act prohibits disclosure of DMV records and information, not any "immigration status" information at issue in § 1373 .............................. 13

             2.    Section 1373 is not a valid preemption provision .......................................... 16

             3.    The Act's protections for driver information are consistent with federal law ......................................................................................... 19

    II.     THE ACT DOES NOT REGULATE OR DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT.................................................................... 22

    III.    THE GOVERNOR AND ATTORNEY GENERAL ARE NOT PROPER PARTIES ........................................................................................ 25

CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Anderson v. La Junta State Bank*,
115 F.3d 756 (10th Cir. 1997) ................................................................. 13

*Arizona Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ..................................................................... 8

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................. 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 7

*Balbuena v. IDR Realty LLC*,
6 N.Y.3d 338 (2006) ................................................................................. 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................. 7

*Bradley v. Public Utilities Comm'n of Ohio*,
289 U.S. 92 (1933) .................................................................................... 8

*Castle v. United States*,
No. 15-cv-197, 2017 WL 6459514 (N.D.N.Y. Dec. 18, 2017) ............................. 24

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011) ................................................................................. 20

*City & County of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018), *aff'd in part and vacated in part
on unrelated grounds*, 965 F.3d 753 (9th Cir. 2020) ................................... 15, 17, 18

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018), *aff'd in part and vacated in part
on unrelated grounds*, 888 F.3d 272 (7th Cir. 2018) ........................................... 17

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) .............................................................. 10, 21

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ..................................................................... 21

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) ................................. 11

**Cases**                                                                                          **Page(s)**

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018), *aff'd in part and vacated in part*
    *on unrelated grounds*, 916 F.3d 276 (3d Cir. 2019) ......................................................... 10, 15

*Colorado v. United States Dep't of Justice*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) ....................................................................................... 18

*County of Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J. 2020), *aff'd sub nom*, 8 F.4th 176 (3d Cir. 2021)................ 13, 15

*Cubas v. Martinez*,
    8 N.Y.3d 611 (2007) ..................................................................................................................... 4

*DeCanas v. Bica*,
    424 U.S. 351 (1976) ...................................................................................................................... 8

*Gazzola v. Hochul*,
    No. 22-cv-1134, 2022 WL 17485810 (N.D.N.Y. Dec. 7, 2022)................................................ 25

*Hohman v. Eadie*,
    894 F.3d 776 (6th Cir. 2018)...................................................................................................... 13

*In re Dairy Mart Convenience Store, Inc.*,
    411 F.3d 367 (2d Cir. 2005)........................................................................................................ 25

*In re Grand Jury Subpoena to Facebook*,
    Nos. 16-mc-1300 to 1314, 2016 WL 9274455 (E.D.N.Y. May 12, 2016) ............................... 13

*Jackson-Mau v. Walgreen Co.*,
    115 F.4th 121 (2d Cir. 2024)...................................................................................................... 16

*Kane v. New Jersey*,
    242 U.S. 160 (1916) ...................................................................................................................... 9

*Kansas v. Garcia*,
    589 U.S. 191 (2020) .................................................................................................................... 20

*Kearns v. Cuomo*,
    415 F. Supp. 3d 319 (W.D.N.Y. 2019), *aff'd* 981 F.3d 200 (2d Cir. 2020) ......................... 6, 12

*Kearns v. Cuomo*,
    981 F.3d 200 (2d Cir. 2020)...................................................................................................... 6, 16

**Cases**                                                                        **Page(s)**

*Libertarian Party of Erie Cnty. v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020)........................................................................... 25

*Mackey v. Montrym,*
    443 U.S. 1 (1979) ........................................................................................... 10

*Marsh v. Rosenbloom,*
    499 F.3d 165 (2d Cir. 2007)........................................................................... 20

*McHenry Cnty. v. Raoul,*
    44 F.4th 581 (7th Cir. 2022)...................................................................... 23, 24

*Merola v. Cuomo,*
    427 F. Supp. 3d 286 (N.D.N.Y. 2019), *appeal dismissed* (2d Cir. 2020) ................................. 6

*Metropolitan Life Ins. Co. v. Massachusetts,*
    471 U.S. 724 (1985) ...................................................................................... 10

*Murphy v. National Collegiate Athletic Ass'n.,*
    584 U.S. 453 (2018) ............................................................... 7, 16, 17, 18

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995) ........................................................................................ 8

*New York State Telecomms. Ass'n., Inc. v. James,*
    101 F.4th 135 (2d Cir. 2024)............................................................................ 8

*North Dakota v. United States,*
    495 U.S. 423 (1990) ................................................................................... 23, 24

*Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey,*
    8 F.4th 176 (3d Cir. 2021)............................................................................. 18

*Oregon v. Trump,*
    406 F. Supp. 3d 940 (D. Or. 2019).................................................................. 18

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................................................ 8

*Printz v. United States,*
    521 U.S. 898 (1997) ...................................................................................... 21

*Steinle v. City and County of San Francisco,*
    919 F.3d 1154 (9th Cir. 2019)........................................................................ 15

**Cases**                                                                     **Page(s)**

*Stoianoff v. Commissioner of Motor Vehicles,*
    107 F. Supp. 2d 439 (S.D.N.Y. 2000), *aff'd* 12 F. App'x 33 (2d Cir. 2001) ............................ 4

*United States v. Arcata,*
    629 F.3d 986 (9th Cir. 2010) ................................................................................. 23

*United States v. California,*
    314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in part and vacated in part
    on unrelated grounds,* 921 F.3d 865 (9th Cir. 2019) ........................................... 17, 24

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ......................................................................... 14, 21, 25

*Wallace v. New York,*
    40 F. Supp. 3d 278 (E.D.N.Y. 2014) ........................................................................ 9

*Washington v. United States,*
    460 U.S. 536 (1983) .............................................................................................. 24

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................................................................................ 8

**Federal Laws**

8 U.S.C. § 1182 .......................................................................................................... 16
8 U.S.C. § 1226 .......................................................................................................... 20
8 U.S.C. § 1227 .......................................................................................................... 16
8 U.S.C. § 1324 .......................................................................................................... 16
8 U.S.C. § 1360 .......................................................................................................... 15
8 U.S.C. § 1367 .......................................................................................................... 15
8 U.S.C. § 1373 ....................................................................................... 13, 14, 20, 21
8 U.S.C. § 1644 .......................................................................................................... 13
12 U.S.C. § 3405 .................................................................................................. 12, 20
15 U.S.C. § 1681b ................................................................................................ 12, 23
18 U.S.C. § 2703 .................................................................................................. 12, 20
18 U.S.C. § 2721 .................................................................................................. 12, 19
18 U.S.C. § 2723 .................................................................................................. 19, 23
18 U.S.C. § 2724 .......................................................................................................... 19
18 U.S.C. § 2725 .......................................................................................................... 19
26 U.S.C. § 6103 .......................................................................................................... 23
49 U.S.C. § 30301 et seq .............................................................................................. 5
REAL ID Act § 201 (codified at 49 U.S.C. § 30301 note) ............................................ 3
REAL ID Act § 202 ...................................................................................................... 3

**State Laws**                                                           **Page(s)**

Ch. 37, 2019 N.Y. Laws ................................................................ 4
Ch. 81, §§ 209-210, 1995 N.Y. Laws 2282 ................................................................ 4
Gen. Bus. Law § 899-aa ................................................................ 12
Pub. Officers Law § 96 ................................................................ 11
VTL § 201 ................................................................ passim
VTL § 502 ................................................................ 3, 4, 5, 15
VTL § 508 ................................................................ 5

**Regulations**

15 N.Y.C.R.R. § 3.9 ................................................................ 4

6 C.F.R. § 37.3 ................................................................ 16
6 C.F.R. § 37.71 ................................................................ 3
22 C.F.R. § 41.2 ................................................................ 3
22 C.F.R. § 235.1 ................................................................ 3

## PRELIMINARY STATEMENT

In June 2019, the New York State Legislature enacted the Driver's License Access and Privacy Act ("the Act"). The purpose of the Act is to promote the State's interests in public safety and economic growth by increasing the number and percentage of licensed and insured drivers on the State's roads. To ensure that those newly eligible for driver's licenses under the Act are not deterred from coming forward to apply for them because of concerns that their personal information will be turned over to federal immigration authorities, the Act bars release of such information except as required by law, and requires the State Department of Motor Vehicles ("DMV") to notify individuals upon receipt of a request from immigration authorities for their personal information.

More than five years after the Act took effect, the United States commenced this action against the State of New York, New York Governor Kathy Hochul, New York Attorney General Letitia James, and DMV Commissioner Mark J.F. Schroeder, seeking to invalidate the Act. Plaintiff's central contention is that the Act's restrictions on the sharing and use of DMV records and information for civil immigration enforcement purposes are preempted by federal law.

This Court should dismiss the complaint in its entirety. The Act is a valid exercise of the State's traditional police powers, and the State's decision to disregard immigration status and protect personal information does not violate any provision of federal law or obstruct enforcement of the federal immigration laws. The provision of federal law relied on by plaintiff, 8 U.S.C. § 1373, which pertains to immigration status information, simply does not reach the DMV records and information protected by the Act (such as photographs and addresses), even if DMV maintained immigration status information (which it does not). Section 1373 is not a valid preemption provision in any event because it does not regulate private actors but instead

impermissibly directs state legislatures to refrain from enacting any rules governing the handling of certain types of information by state officials. More fundamentally, plaintiff's preemption claim fails because it has not identified a single federal statute that imposes a conflicting obligation on the part of state entities and officials, or mandates state cooperation with federal immigration efforts. Nor can plaintiff do so. To the contrary, the Tenth Amendment permits States to decline from assisting in the administration of federal regulatory schemes. The New York Legislature's constitutionally permissible determination that the State's interests are best served by not involving DMV in immigration enforcement cannot be invalidated under any principle of preemption. The Court should further disregard plaintiff's speculative, conclusory, and unfounded assertions about impairing public safety where those allegations do not bear on the preemption claim at issue here.

The Act's information sharing restrictions also do not violate the intergovernmental immunity doctrine. The Act's disclosure prohibitions are directed to state officials and do not purport to regulate the federal government. Requiring those with access to protected DMV information to certify that the information will not be disclosed or used for unauthorized purposes merely regulates the uses of the underlying information, and does not prohibit federal officials from enforcing the immigration laws. In any event, the challenged provisions of the Act apply evenhandedly to protect DMV information in response to all requests for records and information, and does not impermissibly discriminate against the federal government. Whatever incidental burden might arise from the challenged provisions on immigration enforcement activities is justified by the State's exercise of its Tenth Amendment right to decline from assisting in federal civil immigration enforcement efforts. And neither Governor Hochul nor Attorney General James are proper parties to this action where there are no allegations that either official has any role in the enforcement or administration of the Act's provisions.

## STATEMENT OF THE CASE

### I.    STATUTORY AND REGULATORY FRAMEWORK

New York Vehicle and Traffic Law (VTL) mandates that DMV issue driver's licenses to all persons who meet the statutory eligibility criteria—that is, all persons who are able to "furnish [] proof of identity, age, and fitness." VTL § 502(1). There are three general categories of non-commercial driver's licenses issued by DMV in New York: (1) standard licenses; (2) REAL ID-compliant licenses; and (3) enhanced licenses.[1] The latter two types of licenses may be used for federal purposes—such as for gaining entry to federal facilities and boarding federally-regulated commercial aircrafts, or in lieu of passports for certain types of international travel—and are issued by DMV pursuant to federal requirements. See REAL ID Act § 201(3) (codified at 49 U.S.C. § 30301 note); 22 C.F.R. §§ 41.2(a)(6), 235.1(d) (enhanced driver's licenses for use as travel documents). To issue a REAL ID-compliant license, a State must, among other things, verify an applicant's lawful presence with federal databases, and maintain copies of the proofs of eligibility for a REAL ID license submitted by the applicant. See REAL ID Act § 202(b)-(d). Enhanced licenses have similar issuance requirements as REAL ID licenses.[2] The REAL ID Act permits States to issue licenses that are exempt from federal requirements without first verifying an applicant's lawful presence in the U.S. Id. § 202(d)(11); 6 C.F.R. § 37.71(a). In New York, these are known as standard licenses, which any resident can opt for. Numerous other States have enacted similar not-for-federal-purpose licensure schemes. See infra at 9 n.6.

In 2019, the New York Legislature adopted the Act to amend the VTL's provisions

---

[1] The Act did not amend the standards for issuing commercial driver's licenses or information sharing concerning applicants for such licenses. Commercial licenses are issued pursuant to different requirements not relevant here.

[2] See, e.g., https://dmv.ny.gov/driver-license/enhanced-or-real-id (last visited Mar. 24, 2025).

pertaining to the issuance of standard driver's licenses. *See* Ch. 37, 2019 N.Y. Laws. Based on the Legislature's view that an individual's citizenship or immigration status is irrelevant to the licensure determination, the Act instructs DMV to issue standard driver's licenses to all eligible state residents without regard to citizenship or immigration status.[3] VTL § 502(8)(b). The Act also strengthens the confidentiality protections for the personal information maintained by DMV about all license holders and applicants, including that for standard license applicants. *Id.* § 201(8)-(12).

In particular, the Legislature expanded the types of acceptable proof of identity and age for standard licenses by directing DMV to accept, as primary proofs, various foreign documents, including, but not limited to, foreign passports and foreign driver's licenses. *Id.* § 502(1). The Act also amended the social security number requirement by providing that, in lieu of a social security number or proof of ineligibility for a social security number, *see* 15 N.Y.C.R.R. § 3.9(a), applicants for a standard license may submit an affidavit attesting that they have "not been issued a social security number." *See* VTL § 502(1). Because proof of lawful presence in the U.S. is not required to obtain a standard license, *see id.* § 502(8)(b), the Act prohibits DMV from inquiring about an applicant's citizenship or immigration status for such licenses, *id.* § 502(8)(e)(ii). The Act also restricts the collection and retention of information pertaining to "citizenship or immigration status," social security number eligibility, and the type of documents used by applicants to prove age or

---

[3] Although no provision of New York law has ever expressly conditioned the issuance of a license on an applicant's citizenship or immigration status, the types of proof of identity adopted over time had the practical effect of precluding undocumented immigrants, among others, from obtaining licenses. *See generally Cubas v. Martinez*, 8 N.Y.3d 611, 617-20 (2007). Specifically, in 1995, the Legislature amended the VTL to require that individuals provide a social security number when applying for or renewing a driver's license. *See* Ch. 81, §§ 209-210, 1995 N.Y. Laws 2282, 2368. The addition of this requirement had nothing to do with immigration enforcement, but was intended to allow the State to "identify individuals who have failed to make child or spousal support payments and, where necessary, to suspend that person's driver's license." *See Stoianoff v. Commissioner of Motor Vehicles*, 107 F. Supp. 2d 439, 443 (S.D.N.Y. 2000), *aff'd,* 12 F. App'x 33 (2d Cir. 2001); Ch. 81, §§ 209-210, 1995 N.Y. Laws.

identity for standard licenses. *See id.* § 502(8)(c)(i)-(iii), (8)(d).

Additionally, the Act protects applicants' personal information (the "confidentiality provisions"), as follows:

- First, for all non-commercial license applicants, the Act provides that certain personal information and records maintained by DMV are "not . . . public record[s]"—namely, an applicant's "social security number, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, and medical information or disability information"—and prohibits DMV from disclosing such non-public information and records except (a) to the subject of the information, (b) where disclosure is "expressly required" by the National Driver Register,[4] or (c) as mandated by a court order, judicial warrant, or state criminal or civil subpoena. *See id.* §§ 201(8), 508(3);

- Second, the Act prohibits DMV from disclosing the "original documents or copies of documents" collected from all non-commercial license applicants to prove "identity, age, or fitness," and DMV records that would show whether a particular license is a standard license or one that meets federal standards, except (a) to the subject of the information, (b) where disclosure is "expressly required" by the National Driver Register, or (c) as mandated by a court order, judicial warrant, or state criminal or civil subpoena. *See id.* § 201(9)-(10); and

- Third, except as necessary to issue a REAL ID or enhanced license or in other circumstances not relevant here, the Act prohibits DMV from disclosing or making accessible "in any manner records or information" it maintains to federal immigration authorities, absent a court order or judicial warrant. *See id.* § 201(12)(a), (c).

The Act also requires that DMV, within three days of receiving a request for information or records from federal immigration authorities, provide written notification to the subject of the request and the identity of the requesting agency (the "notification provision"). *Id.* § 201(12)(a). The Act further mandates DMV to "require any person or entity that receives or has access to records or information from [DMV]" to certify that the recipient of the information will not use the information for "civil immigration purposes," or disclose the information to federal

---

[4] The National Driver Register is a system that permits information sharing about certain drivers whose licenses have been suspended or revoked, or who have been convicted of serious traffic-related offenses. *See* 49 U.S.C. § 30301 et seq.

5

immigration authorities unless that disclosure is "pursuant to a cooperative arrangement between city, state and federal agencies" unrelated to immigration enforcement (the "certification provision"). *See id.* § 201(12)(b).

## II.    PRIOR PROCEEDINGS AND PROCEDURAL HISTORY

The Act was enacted in June 2019 and took effect in December 2019. In the months between the Act's enactment and its effective date, Michael Kearns (County Clerk for Erie County) and Frank Merola (County Clerk for Rensselaer County), two local officials responsible for administering DMV's licensing functions in their respective counties, challenged the Act in two separate federal actions filed in the Western District of New York and in this Court. *See Kearns v. Cuomo*, 415 F. Supp. 3d 319 (W.D.N.Y. 2019), *aff'd,* 981 F.3d 200 (2d Cir. 2020); *Merola v. Cuomo*, 427 F. Supp. 3d 286 (N.D.N.Y. 2019), *appeal dismissed* (2d Cir. 2020). Kearns claimed, among other things, that the Act's confidentiality, notification, and certification provisions conflicted with federal immigration laws (including 8 U.S.C. § 1373) and that administering the Act's provisions exposed him to criminal prosecution for harboring undocumented persons. Merola raised similar claims, and alleged that the Act would facilitate voting fraud. Both challenges failed on threshold grounds. *See Kearns*, 415 F. Supp. 3d 319 (lack of standing); *Merola*, 427 F. Supp. 3d 286 (lack of capacity).

In February 2025, more than five years after the Act took effect, plaintiff commenced the instant action seeking to invalidate the Act, purportedly based on preemption. The complaint names as defendants the State of New York, and Governor Kathy Hochul, Attorney General Letitia James, and DMV Commissioner Mark J.F. Schroeder, in their respective official capacities. The complaint alleges that the Act's confidentiality, notification, and certification provisions are "expressly preempted" by 8 U.S.C. § 1373 and "conflict preempted" by the federal immigration

laws (Count I). Compl. (ECF No. 1) ¶¶ 44, 46-48. Plaintiff also claims that the Act improperly

seeks to regulate (Count II) and discriminate against (Count III) the federal government. *Id.* ¶¶ 50-

57. Plaintiff seeks a declaration from this Court invaliding the Act in its entirety and an injunction

barring its enforcement. *Id.* at 15-16. This motion followed.

**STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion to dismiss, the pleading must contain sufficient factual

allegations which state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). A claim is "plausible on its face" when it is supported by enough "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In the context of a Rule

12(b)(6) motion, courts must generally accept all well-pled factual allegations as true, but need not

credit conclusory statements or legal conclusions. *See Iqbal*, 556 U.S. at 678.

**ARGUMENT**

## I.    THE ACT IS NOT PREEMPTED BY FEDERAL LAW

Federalism, a central tenet of the Constitution, is grounded in the concept that both federal

and state governments "have elements of sovereignty the other is bound to respect." *Arizona v.

United States*, 567 U.S. 387, 398-99 (2012). Where each sovereign enacts laws that conflict, the

Constitution's Supremacy Clause operates as a "rule of decision," preempting the conflicting state

law in favor of federal law. *Murphy v. National Collegiate Athletic Ass'n.*, 584 U.S. 453, 477

(2018). Preemption may be express or implied, but as the Supreme Court has explained, all types

of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers

rights on private actors; a state law confers rights or imposes restrictions that conflict with the

federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.*

Plaintiff claims that certain of the Act's confidentiality provisions, and the notification and certification provisions are preempted by federal law under express and conflict theories. Specifically, plaintiff relies on 8 U.S.C. § 1373(a) as the basis for its express preemption claim, and alleges that the challenged provisions of the Act also pose an obstacle to the enforcement of the federal immigration laws. Plaintiff is wrong on all counts.

### A. The Act Is Presumed Valid Because It Regulates on Matters of Traditional State Interest

While Congress has the power to preempt state and local laws under the Supremacy Clause, courts have consistently recognized that there is a general presumption against preemption. *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). This presumption "is especially strong" with respect to state laws that implicate a State's traditional police powers, *see Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 356 (2006), and is only overcome where Congress's intent to preempt is "clear and manifest," *New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135, 148 (2d Cir. 2024) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)) (cleaned up).

Although Congress has preempted state laws with respect to the naturalization, entry, and removal of noncitizens from the U.S., States retain broad powers to enact and enforce generally applicable laws addressing "essentially local problems." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976); *Bradley v. Public Utilities Comm'n of Ohio*, 289 U.S. 92, 95-96 (1933) (regulation of roadways). States are thus permitted to legislate for all persons within their borders, including undocumented persons. *See DeCanas*, 424 U.S. at 355-56; *Plyler v. Doe*, 457 U.S. 202, 215 (1982).

Here, the Act is entitled to the strong presumption against preemption because it regulates in areas of "traditional state concern": the issuance of driver's licenses, *see Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 973 (9th Cir. 2017), and the safety of its roads, *Kane v. New Jersey*,

242 U.S. 160, 167 (1916). The Legislature determined that the State's economic and public safety interests are furthered if "all residents of New York, including undocumented immigrants," are able to secure driving privileges. *See* N.Y. Senate, Sponsor's Mem. in Support of Legislation at 1 ("Purpose or Idea of Bill: To provide for the licensure of drivers in order to enhance public safety."). The legislative history is replete with support for the Act's central premise that permitting more state residents, including undocumented persons who are already present and likely driving on the roads, to become licensed drivers would enhance public safety, generate additional tax and DMV revenues, and lower uninsured motorist insurance premiums for all drivers by reducing the number of uninsured drivers on New York's roads.[5] The anticipated positive impacts to public safety are well supported by the experience of other States with similar licensure laws.[6] *See* States' Amicus Br. at 16-25, *filed in Kearns v. Cuomo* (2d Cir. No. 19-3767 (ECF No. 49)). The clear statements of the Act's legislative purposes are not defeated by plaintiff's selective out-of-context quotes suggesting to the contrary. *Compare* Sponsor's Mem. at 2 *with* Compl. ¶ 35; *see Wallace v. New York*, 40 F. Supp. 3d 278, 308-09 (E.D.N.Y. 2014) ("subjective intent expressed by one or more legislators" during debates insufficient to invalidate statute).

To effectuate its aims, the Legislature amended the types of proof that DMV must accept as primary proofs of identity and age for licensure. Because the Legislature deemed an applicant's immigration status to be irrelevant to his or her ability to drive safely, it prohibited DMV from

---

[5] *See* N.Y. Assembly Debates on Bill A3675B at 113 (June 12, 2019) (citing City Comptroller report that licensing undocumented persons will generate $9.6 million in license fees to the State, boost auto sales by nearly 3 percent, and generate $4.2 million in registration and title fees); *id.* at 115-116, 193 (anticipated reductions in insurance premiums); *id.* at 195-96 (citing estimates that Act will generate $50-$57 million in additional annual revenues to the State).

[6] As of 2024, a total of nineteen States (including New York), the District of Columbia and Puerto Rico have adopted laws permitting the licensing of drivers without regard for immigration status. *See* https://tinyurl.com/2verex86 (last visited Mar. 24, 2025). Several States have enacted confidentiality provisions similar to those challenged in this case.

inquiring about it in performing the agency's licensing functions. Moreover, the Legislature enacted confidentiality protections for all driver information, and directed DMV to refrain from using state resources for purposes unrelated to the agency's core responsibilities. These are permissible choices squarely within the State's traditional police powers. *See Mackey v. Montrym*, 443 U.S. 1, 17 (1979) (State has a "paramount interest" in "preserving the safety of its public highways" by regulating those able to drive on its roads); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons") (cleaned up).

The Act thus enjoys a strong presumption of validity. Indeed, the complaint is entirely silent as to how the Act's provisions governing licensure, acceptable proofs of identity, and the handling of applicant proofs are relevant to federal immigration enforcement (*e.g.*, VTL § 502(1), (6)(a), (7)-(8)), or why they should be invalidated. The complaint also fails to set forth any allegations directed to the bulk of the Act's confidentiality provisions that do not expressly pertain to federal immigration officials (*see* VTL §§ 201(8)-(11), 508(2)). There is thus plainly no basis for enjoining the Act in its entirety as plaintiff seeks.

## B.    The Confidentiality, Notification, and Certification Provisions Further the Statutory Scheme

The challenged provisions of the Act reflect the Legislature's recognition that for the public safety and economic goals of the Act to be realized, the persons whom the Act makes newly eligible for driver's licenses must come forward to apply for them. It is well recognized that fear among immigrant communities that any contact with government officials "will bring the scrutiny of federal immigration authorities to their home" may deter noncitizens from reporting crime or accessing government benefits. *See, e.g.*, *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018) (recounting

"credible" testimony of city official that immigrant residents are less likely to use city services if they worry that their immigration status "would be readily revealed to ICE as a result"). The Second Circuit has likewise observed that "[t]he obtaining of pertinent information, which is essential to the performance of a wide variety of state and local government functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved." *City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999).

The Act's confidentiality provisions were similarly intended to counter eligible residents' potential hesitance to avail themselves of the Act's benefits. Consistent with preexisting state confidentiality policies, *see, e.g.*, Pub. Officers Law § 96, the confidentiality provisions prohibit DMV from sharing the personal information of *all* non-commercial license applicants—not just those for standard license holders and applicants—except pursuant to a civil or criminal subpoena or a federal court order or warrant. *See* VTL § 201(8)-(10). For standard license holders and applicants, the Act further prohibits DMV from disclosing personal information obtained for a licensing purpose with federal immigration authorities, but expressly permits disclosure where mandated by law (*i.e.*, by a federal court order or a judicial warrant). *Id.* § 201(12)(a). Although the Act restricts the ability of third parties with access to DMV records and information to use such records and information for "civil immigration enforcement purposes," nothing in its text expressly restricts the use or disclosure of DMV information for criminal law enforcement purposes, *id.* § 201(12)(b), nor has plaintiff so alleged. And the Act expressly permits the sharing of information with federal immigration authorities so long as the information sharing is "pursuant to a cooperative arrangement between city, state and federal agencies" unrelated to immigration enforcement. *See id.* § 201(12)(b)(ii).

The confidentiality provisions reflect the Legislature's attempt to balance individual

privacy and governmental interests, and to accomplish the legislative goals of the Act by reassuring eligible license applicants that their personal information will be kept confidential and not shared for purposes unrelated to licensing to the extent permitted by law. These provisions also reinforce DMV's longstanding internal policy that permits DMV employees and agents to access DMV records or information "only when necessary for official DMV business." *Kearns*, 415 F. Supp. 3d at 323-24 (citing DMV, *Protection of Department Records* 1 (rev. Jan. 2019)). The certification provision simply ensures that confidential DMV information is protected from unauthorized downstream disclosures once it is initially released, echoing the protections in federal law. *See* 18 U.S.C. § 2721(c) (prohibiting downstream redisclosure of protected driver information by authorized recipients); *see also, e.g.*, 15 U.S.C. § 1681b(b)(1) (permitting consumer credit reports to be disclosed only "for employment purposes" and requiring certification from recipient).

The notification provision, which requires DMV to notify individuals upon receipt of a request seeking their personal information, recognizes that individuals have a right to be notified when their personal information will be disclosed to third parties. *See* VTL §201(12)(a). Such provisions are commonplace: the government is mandated in a variety of contexts to provide notice to persons when it requests their personal information from third parties. *See, e.g.*, 18 U.S.C. § 2703(b)(1)(B) (notification required when seeking electronic communications from communications provider pursuant to administrative warrant); 12 U.S.C. § 3405(2) (notification required when seeking financial records through administrative subpoena or summons); *see also* Gen. Bus. Law § 899-aa (requiring notification if confidential personal information is released). These provisions recognize that individuals have privacy interests in their personal information, and seek to "strike a balance" by providing individuals the opportunity to assert their privacy interests when a request for their personal information is made, while permitting legitimate law

enforcement activity. *See, e.g.*, *Anderson v. La Junta State Bank*, 115 F.3d 756, 758 (10th Cir. 1997); *Hohman v. Eadie*, 894 F.3d 776, 782 (6th Cir. 2018). There is accordingly no basis for plaintiff's suggestion (Compl. ¶¶ 27, 48) that notifying the subject of a request for information is akin to helping the subject evade detection from federal authorities. *See, e.g.*, *In re Grand Jury Subpoena to Facebook*, Nos. 16-mc-1300 to 1314, 2016 WL 9274455, at *4 (E.D.N.Y. May 12, 2016) (rejecting contention that notifying subject of subpoena will lead to obstruction).

## C.    The Challenged Portions of the Act Do Not Conflict with Federal Law

In the face of the Act's strong presumption of validity, plaintiff nonetheless contends that the Act's restrictions on sharing DMV records and information with immigration authorities are "expressly preempted" by § 1373(a).[7] Compl. ¶ 44. Plaintiff further alleges that the Act's restrictions pose an obstacle to immigration enforcement efforts by denying immigration officials access to DMV information, and thus should be invalidated under conflict preemption principles. *See* Compl. ¶¶ 46-48. None of these contentions have merit.

### 1.    The Act prohibits disclosure of DMV records and information, not any "immigration status" information at issue in § 1373

As a threshold matter, plaintiff's preemption claim based on § 1373 fails because § 1373 simply does not reach the DMV records and information that the Act protects. Section 1373(a) provides that a "State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from" federal immigration officials

---

[7] The complaint primarily relies on and quotes from 8 U.S.C. § 1373(a). It also cites 8 U.S.C. §§ 1373(b) and 1644 on one occasion, without discussion. *See* Compl. ¶ 25. Section 1373(b) is similar to § 1373(a) and prohibits, among other things, a "person or agency" from restricting state and local entities and officials from sending "immigration status" information to federal immigration officials. 8 U.S.C. § 1373(b). Section 1644 is nearly identical to 8 U.S.C. § 1373(a), except it pertains only to "information regarding immigration status." Courts have consistently held that the relevant provisions in §§ 1373 and 1644 have no meaningful differences and have analyzed them together. *See, e.g.*, *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 371-72 & n.13 (D.N.J. 2020) (collecting cases).

"information regarding the citizenship or immigration status, lawful or unlawful, of any individual." As the statutory text makes clear, section 1373(a) concerns "information regarding the citizenship or immigration status, lawful or unlawful." On the other hand, the Act protects DMV records and information, which consists of photographs, address, and vehicle registration information, among other things. *See* VTL § 201(8). Plaintiff contends, however, that address or registration information constitutes "information regarding . . . immigration status" because such information may be "relevant to [various] immigration-status determinations" or "used to determine the whereabouts and presence" of individuals subject to removal. *See* Compl. ¶¶ 38-40.

This strained construction cannot be squared with the plain text of the statute. Not surprisingly, it has been rejected by every federal court to have considered it. For example, in *United States v. California*, another preemption action, the Ninth Circuit expressly declined to adopt the precise construction of "information regarding . . . immigration status" that plaintiff advances here,[8] finding that the phrase is "naturally understood" to mean only immigration classification, *i.e.*, "what one's immigration status is." *See* 921 F.3d 865, 891-92 (9th Cir. 2019). Because "the range of facts that might have some connection to federal removability or detention decisions is extraordinarily broad," the Ninth Circuit held that the contrary construction urged by plaintiff would be unworkably boundless in its reach. *Id.* at 891-92 & n.17. Further, the court reasoned that Congress's choice of broader or more precise language in other parts of the federal immigration laws evinced the narrower scope of § 1373(a)'s reach. *See id.* at 892 (citing 8 U.S.C.

---

[8] *Compare* Br. for Appellant, *United States v. California*, No. 18-16496 (9th Cir.), 2018 WL 4641711, *50-51 (Sept. 18, 2018) (arguing address information is covered under § 1373 because it may reveal "whether the [individual] has kept DHS informed of any change of address as required under 8 U.S.C. § 1305" and "whether an [individual] admitted in a particular nonimmigrant status has . . . violated the terms and conditions of such admission (*e.g.*, engaged in unauthorized employment)" such that the individual may be subject to removal) *with* Compl. ¶ 38 (positing identical hypotheticals).

14

§§ 1360(a) (mandating "such other relevant information as the Attorney General shall require as an aid"), 1360(b) ("information . . . as to the identity and location" of noncitizens)); *see, e.g.*, 8 U.S.C. § 1367(a)(2) (prohibiting disclosure of "any information which relates to" a noncitizen).

Other courts have likewise consistently interpreted "information regarding . . . immigration status" in § 1373 narrowly to cover only a person's citizenship or category of immigration status, and not every piece of information that may bear on removability. *See Steinle v. City and County of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 378 n.20 (D.N.J. 2020); *Philadelphia*, 309 F. Supp. 3d at 332, *aff'd in part and vacated in part on unrelated grounds*, 916 F.3d 276 (3d Cir. 2019); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 967 (N.D. Cal. 2018), *aff'd in part and vacated in part on unrelated grounds*, 965 F.3d 753 (9th Cir. 2020). So too should this Court.

Properly construed, the complaint is devoid of any allegations that plausibly establish that DMV possesses or maintains "information regarding . . . immigration status"—that is, records or information as to an applicant's immigration status classification. Nor could it, since the Act expressly prohibits DMV from inquiring about "the citizenship or immigration status of any applicant" for a standard license or collecting or retaining information about immigration status. *See* VTL § 502(8)(e)(i). Thus, there is no opportunity for DMV officials to learn of a person's immigration status information in the course of performing their duties in the first place.

While certain established proofs may demonstrate a person's lawful immigration status, none of the forms of proofs that the Act requires DMV to accept for standard licenses supports a clear inference of unlawful status. Both federal immigration law and regulations recognize that certain individuals without valid visas or who entered the country illegally may be regarded as having "lawful status" (and be eligible for REAL ID licenses) based on other circumstances—such

as a pending asylum application or deferred action status—that DMV officials processing license applications would have no reason to know. *See* 6 C.F.R. § 37.3. As plaintiff's own allegations demonstrate, questions about an individual's immigration status are governed by a complex federal scheme and can be far from straightforward. *See* Compl. ¶ 38; *see also, e.g.*, 8 U.S.C. §§ 1182 (listing myriad factors that bear on admissibility, such as education, financial resources, medical information), 1227 (deportability factors). The Legislature has reasonably determined that none of these considerations are relevant to the decision of whether to license a driver.

In sum, section 1373, which pertains to immigration status information, does not conflict with the Act's protections for DMV records and information. And because administering the Act's licensure provisions for standard licenses would not give rise to any "actual or constructive notice of the applicant's immigration status" on the part of DMV officials, *Kearns*, 981 F.3d at 209, plaintiff's suggestion that administering the Act's notification provision somehow could constitute criminal harboring of undocumented persons is also meritless. *See* Compl. ¶ 48 (citing 8 U.S.C. § 1324(a)); *Kearns*, 981 F.3d at 208-09 (rejecting same arguments about § 1324(a)).

### 2.    Section 1373 is not a valid preemption provision

Plaintiff is also mistaken when it alleges that § 1373(a) "expressly preempts" the information sharing restrictions set forth in the Act. Compl. ¶ 44. Express preemption is properly invoked where there is an explicit statutory statement of Congress's intent to displace conflicting state laws in favor of established federal standards. *See generally, e.g.*, *Jackson-Mau v. Walgreen Co.*, 115 F.4th 121, 125-28 (2d Cir. 2024) (food labeling requirements under state and federal law). But as the Supreme Court has explained, "since the Constitution 'confers upon Congress the power to regulate individuals, not States,'" to have preemptive effect, the federal law in question must be "one that regulates private actors." *Murphy*, 584 U.S. at 477-78.

In *Murphy*, the Supreme Court considered whether a federal statute which prohibited state authorization of sports gambling, but did not make sports gambling illegal under federal law, invalidated the New Jersey Legislature's actions in authorizing sports gambling. 584 U.S. at 479-80. In rejecting the express preemption claim, the *Murphy* court held that the federal law was not a valid preemption provision because it did not confer any rights or impose any restrictions on private actors, *id.* at 477-80, but instead impermissibly commandeered state legislatures by telling them what they "may and may not do" in contravention of the Tenth Amendment, *id.* at 474.

Applied here, the plain text of § 1373 forecloses plaintiff's express preemption claim, because the statute is directed at States and state actors—not private individuals—and thus cannot be a valid preemption statute. *Murphy,* 584 U.S. at 477-78. Indeed, plaintiff's own allegation—describing § 1373 as imposing a "requirement that *States* 'not prohibit, or in any way restrict'" sharing of immigration status information with federal immigration officials (Compl. ¶ 44 (emphasis added))—is fatal to its preemption claim. Interpreted in this way, section 1373 "does just what *Murphy* proscribes: it tells States they may not prohibit (*i.e.*, through legislation) the sharing of information regarding immigration status" with the federal government. *See United States v. California*, 314 F. Supp. 3d 1077, 1099 (E.D. Cal. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 869 (N.D. Ill. 2018) (section 1373 "constrains local rule-making by precluding [local] lawmakers from passing laws . . . that institute locally-preferred policies"). Construed as a broad prohibition against state and local governments from being able to adopt *any* rules governing their employees' communications of immigration status information to federal officials, section 1373 violates the Tenth Amendment's anti-commandeering principles as articulated in *Murphy*. *See, e.g.*, *San Francisco*, 349 F. Supp. 3d at 949-53. No principle of preemption overrides the Tenth Amendment's prohibitions against Congress directing the actions of state legislatures. *See Murphy*,

584 U.S. at 477 ("Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress.").

Since *Murphy*, courts have consistently concluded that § 1373 cannot be a basis for preemption. *See, e.g.*, *Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-82 (3d Cir. 2021); *Colorado v. United States Dep't of Justice*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) ("By [its] plain terms, [§ 1373] affect state and local government entities and officials; they do not regulate private actors as *Murphy* requires for preemption."); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019) (same); *San Francisco*, 349 F. Supp. 3d at 950 (§ 1373 "does not regulate private actors or provide private actors with any additional rights.").

The Third Circuit's recent decision in *Ocean County*, which involved a preemption challenge to similar restrictions on information sharing, directly supports the dismissal of plaintiff's preemption claim. There, a group of local government officials challenged executive directives issued by the New Jersey Attorney General which (1) barred county and local law enforcement officials from providing any "non-public personally identifying information regarding any individual" to federal immigration authorities; and (2) required local law enforcement officials to "notify a detained individual" if federal immigration authorities inquired about the individual's scheduled release date or sought to interview the individual. *Ocean Cnty.*, 8 F.4th at 178-79. The plaintiffs in *Ocean County* claimed that the local executive directives were preempted by §§ 1373 and 1644 under express and conflict theories. The Third Circuit had little trouble affirming the dismissal of the preemption claims. In doing so, the appellate court held that the text of § 1373 sets forth "a clear prohibition on *state* action," "cannot be fairly read" as regulating private actors, and thus "cannot serve as a basis for preemption" under any theory. *See id. at* 181-82 (emphasis in original). There is no reason for this Court to depart from these well-

reasoned and unanimous chorus of precedents. The straightforward conclusion that § 1373 is not directed at private actors is dispositive of plaintiff's express preemption claim.

### 3.    The Act's protections for driver information are consistent with federal law

There is also no conflict between federal law and the Act's confidentiality provisions generally restricting the disclosure of driver information for purposes unrelated to licensing, absent a court order, judicial warrant, or subpoena. To the contrary, the challenged provisions of the Act are consistent with the federal policies concerning the protection of driver information embodied in the federal Drivers Privacy Protection Act ("DPPA"). *See generally* 18 U.S.C. § 2721 *et seq*. Originally enacted in 1994, *see* Pub. L. No. 103-322, § 300002(a), 108 Stat. 2099 (1994), the DPPA generally protects against the disclosure of driver personal information, but provides that States "shall" report such information in certain circumstances, such as in matters of motor vehicle or driver safety and theft, 18 U.S.C. § 2721(b). *See id.* § 2725(3)-(4) (defining protected information to include photographs, addresses, social security numbers). By contrast, the DPPA gives a state DMV the choice as to whether to report otherwise protected personal information to other state and federal agencies in carrying out agency functions: it provides that States "may"—but are not obligated to—disclose such information to these agencies. *See id.* § 2721(b)(1).

By enacting the Act's confidentiality provisions, the New York Legislature exercised its prerogative under the DPPA to decide when such permissive disclosures are appropriate. And consistent with the protections Congress established in the DPPA, the Legislature sought to restrict the downstream dissemination of protected DMV records and information for unauthorized purposes, opting to impose a certification requirement enforced by criminal penalties. *Compare id.* §§ 2721(c) (prohibiting redisclosure of protected driver information), 2723, 2724 (criminal and civil penalties) *with* VTL § 201(12)(b) (requiring certification that information will not be

redisclosed or used for unauthorized purposes). And the Act's notification provision likewise finds analogs in federal law. *See, e.g.*, 18 U.S.C. § 2703(b)(1)(B); 12 U.S.C. § 3405(2).

Plaintiff's conclusory allegations that the challenged provisions of the Act pose obstacles to the enforcement of the federal immigration laws cannot withstand a motion to dismiss. As a general matter, to invalidate a state enactment on the theory of conflict preemption, "the conflict between state law and federal policy must be a 'sharp' one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007). Because preemption is not license for a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Chamber of Commerce v. Whiting*, 563 U.S. 582, 599 (2011), in every case, "the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress," *Kansas v. Garcia*, 589 U.S. 191, 202 (2020).

Here, plaintiff's inability to identify any federal statute that gives rise to a conflict necessarily forecloses its preemption claim. Indeed, no provision of federal law obligates state officials or agencies to provide DMV information for standard license applicants to federal immigration authorities. *But see* 8 U.S.C. § 1373(c) (mandating *federal* authorities respond to state and local requests for immigration status information); 8 U.S.C. § 1226(d)(1)(A) (requiring *federal* government to assist state and local authorities to identify noncitizens with criminal convictions). Federal law likewise does not prohibit state agencies from notifying residents when their personal information has been requested by third parties, or restrict the State's ability to obtain assurances directed at preventing unauthorized redisclosures of personal information. And plaintiff fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts. Nor could it.

The Tenth Amendment prohibits Congress from conscripting state and local officials and

resources to assist with federal regulatory schemes, such as immigration enforcement. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (statute requiring local officials to conduct background checks for firearms purchases contravened Tenth Amendment). As other courts have recognized, the federal immigration laws generally "do not suggest the intent—let alone a 'clear and manifest one'—to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (cleaned up) (emphasis in original); *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities.") (emphasis in original). The complaint does not allege to the contrary. Even as to § 1373, plaintiff acknowledges that the statute merely "give[s] state and local officials *the authority* to communicate" with federal immigration authorities. Compl. ¶ 26 (emphasis added); *see* 8 U.S.C. § 1373(b) (titled "[a]dditional *authority* of governmental entities") (emphasis added).

It may be that federal immigration enforcement efforts would be made easier if immigration officials had ready access to all DMV information, but "refusing to help is not the same as impeding." *California*, 921 F.3d at 888; *Chicago*, 888 F.3d at 282 (rejecting argument that refusal to provide information to immigration authorities constitutes "affirmative interference" with immigration enforcement). Nor is that the test for conflict preemption in any event, otherwise "obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles." *California*, 921 F.3d at 888. Ultimately, "the choice of a state to refrain from participation [in immigration enforcement] cannot be invalid under the doctrine of obstacle preemption where . . . it retains the right of refusal" under the Tenth Amendment. *Id. at* 890; *Chicago*, 888 F.3d at 282. Here, the Legislature made the constitutionally permissible choice to decline to involve DMV and its officials with federal immigration enforcement, based on its

determination that doing so will enhance the State's public safety and economic interests by permitting more residents to be licensed to drive. *See supra* at 8-10.

Finally, plaintiff is not aided by its speculative and conclusory allegations that the challenged provisions of the Act will endanger immigration officials or impair criminal law enforcement efforts (Compl. ¶¶ 39-41)—even if such assertions were relevant to the preemption analysis (which they are not). Notably, plaintiff has not alleged any particularized harm resulting from the Act's restrictions, or that any provision of the Act restricts the access of DMV information for criminal law enforcement purposes. *But see* VTL § 201(12)(b) (requiring certification from persons with access to DMV information that they will not "use such records or information for *civil* immigration purposes") (emphasis added). Nor does the Act impose such a restriction on its face. Both before and after the Act's enactment, criminal law enforcement officials at federal agencies (including the FBI and Department of Homeland Security's Homeland Security Investigations division[9]) are able to access DMV information through databases, including NLETS[10] and other systems. Thus, the Act does not impair the ability of federal law enforcement officials to obtain DMV information "as part of ongoing investigations into narcotics smuggling, child exploitation, human trafficking" or other criminal offenses (Compl. ¶ 41).

## II.    THE ACT DOES NOT REGULATE OR DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT

Because the States and the federal government are dual sovereigns, just as the Constitution

---

[9] Homeland Security Investigations is a component within U.S. Immigration and Customs Enforcement responsible for investigating "a wide array of transnational crime" and "disrupting, and dismantling transnational criminal organizations [] and terrorist networks." *See* https://www.ice.gov/about-ice (last visited Mar. 24, 2025).

[10] NLETS (National Law Enforcement Telecommunications System) is a nonprofit entity that operates an electronic messaging system that facilitates federal, state, and local law enforcement and public safety agencies in the sharing of DMV and other information. *See* https://www.nlets.org/about/what-we-do (last visited Mar. 24, 2025).

prohibits Congress from regulating States, it similarly prohibits the States from regulating the federal government. Under the intergovernmental immunity doctrine—the flip side of the Tenth Amendment's anti-commandeering prohibition—a state law is invalid "if it regulates the United States directly or discriminates against the Federal Government." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). The provisions challenged here do neither of these things.

First, plaintiff's assertion that the Act's confidentiality and certification provisions directly regulate the federal government (Compl. ¶ 52) is belied by the Act's plain text, which is directed to "the commissioner, and any agent or employee of the commissioner"—not any federal officials or agencies. *See* VTL § 201(12)(a)-(b). By their plain terms, these provisions merely direct the actions of state officers in the conduct of their state duties, and do not govern the actions of any federal actors or entities. *See McHenry Cnty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022).

Second, the certification provision likewise does not constitute a direct regulation of the federal government. It does not restrict federal immigration officials from carrying out their duties in enforcing the immigration laws. *Contra United States v. Arcata*, 629 F.3d 986, 988, 991 (9th Cir. 2010) (ordinance prohibiting federal military recruiting of minors impermissibly regulated federal government). Rather, the provision simply sets a condition under which DMV information can be accessed and regulates the permissible uses and disclosures of the underlying information once access is granted. Requiring authorized recipients to certify that they will not use confidential information obtained from DMV for unauthorized purposes or disclose them to unauthorized recipients ensures the Act's carefully crafted protections are not circumvented through downstream redisclosures of driver information. Similar examples abound in federal law. *See, e.g.*, 18 U.S.C. § 2721(c) (driver information); 15 U.S.C. § 1681b(b)(1) (credit reports); *see also* 26 U.S.C. § 6103(i)(1)(C) (permitting disclosures of tax return information to state and local law

enforcement but only for limited uses). Any incidental burden that might be imposed on federal immigration officials from the certification requirement is justified by the State's constitutionally permissible "choice to divert its resources away from assisting immigration enforcement efforts." *California*, 314 F. Supp. 3d at 1111.

Third, neither the confidentiality nor certification provisions impermissibly discriminates against the federal government. As the Supreme Court has explained, "the State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983). Additionally, "the question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation. Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory with regard to the [] burdens that result." *North Dakota*, 495 U.S. at 435.

There is no discriminatory treatment here. To the contrary, the Act's confidentiality and certification provisions apply equally to private and governmental actors alike. Although VTL § 201(12)(a) specifically prohibits disclosure of DMV records and information to federal immigration officials, the Act elsewhere imposes a similar disclosure prohibition of non-public DMV information that applies to "any request for records." *Id.* § 201(8). The certification provision is also facially neutral: whether the requester of information is a private business or a state, local, or federal agency, each must provide the required certification in order to receive DMV information, and each are prohibited from using or disclosing the protected information for unauthorized purposes. *See id.* § 201(12)(b). Such restrictions that apply evenhandedly to the federal government and "similarly situated constituents of the State" do not violate the intergovernmental immunity doctrine. *North Dakota*, 495 U.S. at 438; *Raoul*, 44 F.4th at 593; *Castle v. United States*, No. 15-cv-197, 2017 WL 6459514, *12 (N.D.N.Y. Dec. 18, 2017)

(prohibition that applies "with the same force to any person, governmental or private" does not discriminate against federal government).

At bottom, plaintiff's intergovernmental immunity claim is but a repackaging of its defective preemption claim. Where, as here, the State is entitled to decline to assist with federal immigration enforcement efforts, *see* supra at 20-21, extending the intergovernmental immunity doctrine to invalidate the Act's information sharing provisions would effectively render the Tenth Amendment's anti-commandeering prohibition hollow and meaningless. *See California*, 921 F.3d at 891 (rejecting similar intergovernmental immunity claim).

## III.    THE GOVERNOR AND ATTORNEY GENERAL ARE NOT PROPER PARTIES

The complaint names Governor Kathy Hochul and Attorney General Letitia James as official capacity defendants but fails to allege how either of them is involved in the enforcement or administration of the challenged provisions of the Act. The Act's plain language makes clear that it is the DMV Commissioner and DMV employees and agents who are responsible for administering the Act's provisions. *See, e.g.*, VTL § 201(12)(a)-(b). Governor Hochul and Attorney General James are thus not proper parties to this suit and should be dismissed. *See, e.g.*, *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020); *In re Dairy Mart Convenience Store, Inc.*, 411 F.3d 367, 372-73 (2d Cir. 2005). The Attorney General's alleged statements supporting the Act and committing to discharge her statutory duty to defend it (Compl. ¶ 4 & ns. 1, 2) do not warrant a different outcome. *See Gazzola v. Hochul*, No. 22-cv-1134, 2022 WL 17485810, *9 (N.D.N.Y. Dec. 7, 2022).

## CONCLUSION

For the reasons set forth above, the Court should dismiss the complaint in its entirety.

Dated:    New York, New York
          March 25, 2025

                              Respectfully submitted,

                              LETITIA JAMES
                                *New York State Attorney General*
                              Attorney for Defendants


                    By:    /s/ Linda Fang
                              Linda Fang
                              Special Litigation Counsel
                              28 Liberty Street
                              New York, New York 10005
                              (212) 416-8580

                              Alex Powhida
                              Special Litigation Counsel
                              The Capitol
                              Albany, New York 12224
                              (518) 776-2584