UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                      Plaintiff,

     v.

STATE OF NEW YORK; KATHLEEN HOCHUL,
Governor of New York, in her Official Capacity;
LETITIA A. JAMES, Attorney General of New
York, in her Official Capacity; MARK J.
SCHROEDER, Commissioner of the New York
State Department of Motor Vehicles, in his Official
Capacity,

                    Defendant.

Civil Action No. 25-cv-205 (AMN)
(MJK)

---

**BRIEF OF *AMICI CURIAE* RURAL AND MIGRANT MINISTRY, INC.,
NEW YORK IMMIGRANT COALITION, HISPANIC FEDERATION,
LATINOJUSTICE PRLDEF AND MAKE THE ROAD NEW YORK
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 8

CONCLUSION.................................................................................................................. 12

EXHIBIT A: IDENTITY AND INTEREST OF *AMICI CURIAE* AND LOCAL CIVIL RULE 7.2(d) STATEMENT ......................................................................................................... a

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Packers Ass'n v. Indus. Accident Comm'n of Cal.*,
   294 U.S. 532 (1935)............................................................................................................8

*Amer. Fed. of Teachers v. Bessent*,
   -- F. Supp. 3d --, 2025 WL 582063 (D. Md. Feb. 24, 2025) .............................................9, 10

*Calverton Manor, LLC v. Town of Riverhead*,
   75 N.Y.S.3d 586 (2d Dep't 2018) ......................................................................................9

*Doe v. DiGenova*,
   779 F.2d 74 (D.C. Cir. 1985) ............................................................................................10

*Lemon v. Kurtzman*,
   411 U.S. 192 (1973) ..........................................................................................................9

*Perlstein v. Wolk*,
   844 N.E.2d 923 (Ill. 2006) ................................................................................................9

*U.S. Dep't of State v. Ray*,
   502 U.S. 164 (1991) ..........................................................................................................9

**Statutes and Rules**

49 U.S.C. 30301 *et seq.*.......................................................................................................4

N.Y. Comp. Codes R. & Regs. tit. 8, § 100.2(y)(3)(i)(a) .......................................................10

Ch. 37, 2019 N.Y. Laws .......................................................................................................1
   § 2..................................................................................................................................4, 5
   § 3..................................................................................................................................1, 2
   § 4..................................................................................................................................1, 2
   § 5..................................................................................................................................3
   § 6..................................................................................................................................4

VTL § 201 .................................................................................................................4, 5, 6, 10

VTL § 502 .................................................................................................................1, 2, 3, 6, 10

VTL § 508 .................................................................................................................1, 3

Local Civil Rule 7.2(d) ..........................................................................................................1, a

**Other Authorities**

Cataudella, Kimberly & Cambell, Alexia Fernández, Ctr. for Public Integrity,
*Undocumented Immigrants Can Get Licenses.  ICE Can Get Their Data.* (July
13, 2021), https://publicintegrity.org/inequality-poverty-
opportunity/immigration/undocumented-immigrants-licenses-ice-data/...................................6

DMV, *Driver Licenses and the Green Light Law*, https://dmv.ny.gov/driver-
license/driver-licenses-and-the-green-light-law (last visited Mar. 31, 2025)...........................7

DMV, *Resources for Non-US Citizens*, https://dmv.ny.gov/driver-
license/resources-for-non-us-citizens (last visited Mar. 31, 2025)............................................7

Funk, McKenzie, *How ICE Picks Its Targets in the Surveillance Age*, N.Y. Times
Magazine (Updated June 7, 2021),
https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-
deportation.html ........................................................................................................................6

Harwell, Drew, *FBI, ICE Find State Driver's License Photos Are A Gold Mine for
Facial-Recognition Searches*, Washington Post (July 7, 2019),
https://www.washingtonpost.com/technology/2019/07/07/fbi-ice-find-state-
drivers-license-photos-are-gold-mine-facial-recognition-searches/ ........................................6

Healthcare.gov, *Immigrants*,
https://www.healthcare.gov/immigrants/immigration-status/ (last visited Mar.
31, 2025) ...................................................................................................................................10

Heastie, Carl E., *Assembly Passes Driver's License Access and Privacy Act
#GreenLightNY* (June 12, 2019),
https://nyassembly.gov/Press/files/20190612.php ....................................................................2

Herrera, Jack, *DMV Employees Have Been Accused of Collaborating with ICE.
This isn't the First Time*, Pacific Standard (July 8, 2019),
https://psmag.com/news/dmv-employees-have-been-accused-of-collaborating-
with-ice-this-isnt-the-first-time/ ...............................................................................................6

National Immigration Law Center, *FAQ: The Affordable Care Act & Mixed-
Status Families* (May 1, 2024),
https://www.nilc.org/resources/aca_mixedstatusfams/............................................................3

New York Executive Order No. 170, *State Policy Concerning Immigrant Access
to State Services* (Sept. 15, 2017),
https://www.governor.ny.gov/sites/default/files/atoms/files/EO%20%23170.p
df ..............................................................................................................................................10

New York Executive Order No. 6.1, *Continuation of Prior Executive Orders* (Jan.
16, 2025), https://www.governor.ny.gov/sites/default/files/2025-01/executive-
order_6.1.pdf ...........................................................................................................................10

New York Senate, *Senate Passes Driver's License Access and Privacy Act (Green Light NY)* (June 17, 2019), https://www.nysenate.gov/newsroom/press-releases/2019/senate-passes-drivers-license-access-and-privacy-act-green-light-ny ................................................................................................................2

NYC Mayor's Office of Immigrant Affairs, *Driver's Licenses for All*, https://www.nyc.gov/assets/immigrants/downloads/pdf/drivers-licences-for-all.pdf (last visited Mar. 31, 2025) ..............................................................7

NYIC, *Green Light NY: Driving Together*, https://www.nyic.org/wp-content/uploads/2017/07/Copy-of-GREEN-LIGHT-NY-Updated-Factsheet-for-legislators.pdf (last visited Mar. 31, 2025) ..............................................2

Parra, Daniel, *Federal Challenge of NY's Green Light Law is About Fear, Not Safety, Advocates Argue*, City Limits (Feb. 19, 2025), https://citylimits.org/federal-challenge-of-nys-green-light-law-is-about-fear-not-safety-advocates-argue/ ....................................................................2, 8

Spector, Joseph, *Permits Soar in New York as Undocumented Immigrants get Driving Rights*, Democrat & Chronicle (Jan. 16, 2020), https://www.democratandchronicle.com/story/news_politics/albany/2020/01/16/permits-soarundocumented-immigrants-get-new-york-driving-rights/4476749002/ ...........................................................................2

*Amici Curiae* Rural and Migrant Ministry, Inc. ("RMM"), New York Immigrant Coalition, Hispanic Federation, LatinoJustice PRLDEF and Make The Road New York (collectively, "*Amici*")[1] set forth in this brief privacy and notice considerations for individual New York driver's license and learner's permit holders who took advantage of the New York State Driver's License Access and Privacy Act (the "Act"), effective as of December 14, 2019 (collectively, "license-holders"). *See* Ch. 37, 2019 N.Y. Laws ("DLAPA"). *Amici* are uniquely situated to provide these insights given the services and advocacy they provide to and on behalf of immigrant residents within New York State. *Amici* advocated for passage of the Act, and constituents of some *Amici* have since secured driver's licenses or learner's permits.

*Amici* do not seek to reiterate Defendants' arguments, *see* ECF No. 10-1 ("State Br."), but instead seek to address the statutory privacy and notice protections for license-holders and the impact Plaintiff's proposed remedies would have on New York residents who acquired a state-issued driver's license or learner's permit, which cannot be used for federal identification purposes ("standard license"), pursuant to the Act. These New Yorkers sought and received the opportunity to legally drive. In return, the Act provides privacy and notice protections. Stripping license-holders of these protections runs contrary to the statutes they relied upon when they acquired the license from the New York State Department of Motor Vehicles ("DMV").

Respectfully, this Court should grant Defendants' motion to dismiss the Complaint.

## **BACKGROUND**

The 2019 Act amended three sections of New York's Vehicle and Traffic Law ("VTL"): Section 502, Section 508 and Section 201. *See* Ch. 37, 2019 N.Y. Laws ("DLAPA"). Among

---

[1] A description of each *Amici* appears in Exhibit A to this brief, which lists the identity and interest of each *Amici* as well as the statement required by Local Civil Rule 7.2(d).

other things, the amendments to Section 502 permitted New York State residents applying for standard licenses to submit certain proofs of identity and, with their application or renewal, sign an affidavit that they have not been issued a Social Security number. *Id.* at §§ 3-4. Before the Act was signed into law, more than 750,000 New Yorkers over the age of 16 were barred from obtaining a state driver's license because of their immigration status, *i.e.*, because they did not have a Social Security number.[2] When the Legislature passed the Act, New York State Assembly Speaker Heastie recognized the public good behind it: the Act would "create safer roads for all New Yorkers, boost the State's economy and protect hardworking New Yorkers and their families."[3] According to news reports, thousands of New York residents likely applied for and received a standard license in the past five years.[4]

Individuals who took advantage of the Act since 2019 may include certain permanent residents, individuals with family-sponsored visas or non-immigrant temporary visa holders, as

---

[2]    NYIC, *Green Light NY: Driving Together*, https://www.nyic.org/wp-content/uploads/2017/07/Copy-of-GREEN-LIGHT-NY-Updated-Factsheet-for-legislators.pdf (last visited Mar. 31, 2025).

[3] Carl E. Heastie, *Assembly Passes Driver's License Access and Privacy Act #GreenLightNY* (June 12, 2019), https://nyassembly.gov/Press/files/20190612.php; *see also*, *e.g.*, The New York Senate, *Senate Passes Driver's License Access and Privacy Act (Green Light NY)* (June 17, 2019), https://www.nysenate.gov/newsroom/press-releases/2019/senate-passes-drivers-license-access-and-privacy-act-green-light-ny ("This legislation provides additional government revenue, supports New York businesses and increases road safety. Statewide, the Fiscal Policy Institute estimates that this legislation will result in $83.9 million in government revenues over the first three years and $6.4 million in recurring revenue thereafter. In a statement of support, the Business Council of New York State said that this legislation is 'an opportunity to increase these New Yorkers' ability to support local employers and businesses.' In Connecticut, where a similar policy was implemented four years ago, there have been almost 4,000 fewer unlicensed driving convictions and hit-and-run crashes have dropped 9% between 2016 and 2018.").

[4] *See*, *e.g.*, Daniel Parra, *Federal Challenge of NY's Green Light Law is About Fear, Not Safety, Advocates Argue*, City Limits (Feb. 19, 2025), https://citylimits.org/federal-challenge-of-nys-green-light-law-is-about-fear-not-safety-advocates-argue/; Joseph Spector, *Permits Soar in New York as Undocumented Immigrants get Driving Rights*, Democrat & Chronicle (Jan. 16, 2020), https://www.democratandchronicle.com/story/news_politics/albany/2020/01/16/permits-soarundocumented-immigrants-get-new-york-driving-rights/4476749002/.

well as undocumented immigrants, including those who are part of mixed-status families.[5] Importantly, federal immigration laws are nuanced, and it is not correct to assume that all individuals without a Social Security number are present without authorization. For example, individuals may be present on student or employment visas. Immigrant visas may be granted through family or employment, or to those who fit within a category of "special immigrant," which includes certain religious workers and abused minors who need the protection of juvenile court, individuals with refugee or asylee status, victims of human trafficking and crime, victims of abuse and many others. Many individuals present on immigrant visas do not have Social Security numbers until the agencies approve their I-485, *Application to Register Permanent Residence or Adjust Status*, a process with notorious backlogs that often takes years. Temporary visas vary wildly in terms of eligibility requirements, duration, whether they permit workers to bring dependents and other factors, but individuals with nonimmigrant visas may have permission to be lawfully present in the United States. And other individuals may be granted protection from deportation through other federal programs.

The amended Section 502 makes it so that (i) applicants for standard licenses "shall *not* be required to prove that they are lawfully present in the United States" and (ii) standard licenses "shall *not* be used as evidence of a person's citizenship or immigration status." DLAPA at § 5 (emphasis added). In other words, a standard driver's license is immigration- and citizenship-agnostic. Although the DMV Commissioner is required to keep a record of every license issued "which record shall be open to public inspection during reasonable business hours," Section 508 was amended to protect from public inspection certain information held by DMV for *all* non-

---

[5] National Immigration Law Center, *FAQ: The Affordable Care Act & Mixed-Status Families* (May 1, 2024), https://www.nilc.org/resources/aca_mixedstatusfams/ ("A 'mixed-status family' is a family whose members include people with different immigration statuses.").

commercial driver's licenses and learner's permits: "the photo image, social security number, client identification number, name, address, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, medical information or disability information of any holders of, or applicants for, such licenses and permits, and whether such licenses or permits meet federal standards for identification or do not meet federal standards for identification" (together, "Sensitive Information"). *Id.* at § 6.

Section 201, entitled "Custody of Records," was also amended to add five new subdivisions. *Id.* at § 2. New subdivisions 8, 9 and 10 limited disclosure for certain categories of Sensitive Information *for any type of non-commercial driver's license or learner's permit*, including, *inter alia*, an individual's place of birth, country of origin or whether the license or learner's permit does or does not meet federal standards for identification, as well as only disclosing documents to prove identity, age or fitness, (i) to the person who is the subject of such records, (ii) where expressly required pursuant to 49 U.S.C. 30301 *et seq.* (National Driver Register) or (iii) where necessary to comply with a lawful court order, judicial warrant signed by an Article III judge or a subpoena for individual records issued pursuant to the criminal procedure law or the civil practice law and rules. *Id.* at § 2, ¶¶ 8, 9 & 10. New subdivision 11 limited the disclosure of records *whenever* sought by lawful court order, judicial warrant or subpoena to just that information specifically sought through the request. *Id.* at § 2, ¶ 11.

The fifth new subdivision of Section 201, subdivision 12, appears to be the only subdivision Plaintiff seeks to invalidate in this action. *See* ECF No. 1 ("Complaint" or "Compl.") at ¶ 2 ("In 2019, New York amended its Vehicle and Traffic Law to include a provision known as the 'Green Light Law.' *See* N.Y. Veh. & Traf. § 201.12. . . ."); *id.* at ¶ 28 ("In 2019, New York

added Section 201.12 to its Vehicle and Traffic Law (herein, its 'Green Light Law').”); *id.* at ¶¶ 29 -33 (“As amended in 2020, the Green Light Law has three main provisions,” citing to N.Y. Veh. & Traf. § 201.12(a)-(c)); *id.* at Prayer for Relief (only referencing defined term “Green Light Law”).[6] *Amici* refer to this challenged section of the Act as the “Subdivision 12 Provisions.” Those Subdivision 12 Provisions, as initially enacted, restricted the DMV Commissioner from providing records or information, unless required to issue or renew a license or permit that meets federal standards for identification, to “any agency that primarily enforces immigration law or to any employee or agent of such agency,” including U.S. immigration and customs enforcement or customs and border protection, *unless* the Commissioner receives a lawful court order or judicial warrant signed by an Article III judge. DLAPA at § 2, ¶ 12. It was later amended to include other limited exceptions relating to trusted traveler programs and facilitating vehicle imports and/or exports. VTL § 201.12(a). If the DMV Commissioner receives a request from an agency that primarily enforces immigration law, he must notify the individual about the request and which agency made the request within three days. *Id.*

Additionally, if a person or entity receives or has access to “records or information” from the DMV, that person or entity is required to certify that they will not (i) use such records or information for civil immigration purposes or (ii) disclose such records or information to any agency that primarily enforces immigration law or to any employee or agent of any such agency unless a limited exception applies outside of immigration law enforcement. VTL § 201.12(b).

---

[6] *Amici* assume that Plaintiff is not seeking to invalidate any other subdivisions of the Act or strip license-holders of their licenses. For this reason, *Amici* respectfully reserve the right to raise in the future any specific due process or other rights license-holders may have, including those rights that may attach pursuant to the Fourteenth Amendment, through the statutory scheme or by virtue of holding a standard license. *Amici* also respectfully reserve the right to address other issues in the future if Plaintiff revises the scope of the requested relief or otherwise seeks to impinge on any due process or other rights of license-holders if this case proceeds past the motion to dismiss phase.

The certifier must keep a record of all uses and identify "each person or entity that primarily enforces immigration law that received department records or information" from the certifier. *Id.*

Plaintiff challenges the Subdivision 12 Provisions pursuant to the Supremacy Clause, and asks the Court to enter a judgment declaring the Subdivision 12 Provisions unlawful and unenforceable, permanently enjoining Defendants from enforcing the Subdivision 12 Provisions, and awarding fees, costs and any other relief the Court deems just and proper. *See* Compl. at ¶¶ 42-57; *id.* at Prayer for Relief. The State sets forth why the Act does not conflict with the Supremacy Clause, *see generally* State Br., and these arguments are best left to the State.

But when the license-holders submitted their applications to acquire or renew a license, they did so with the understanding—pursuant to the Act—that, among other things, they did *not* need to prove that they were lawfully present in the U.S. and that their standard licenses would *not* be used as evidence of their citizenship or immigration status. VTL § 502(b) & (e)(i). The reality is that many immigrants fear that interactions with state actors comes with immigration consequences. Fear that access to information submitted to acquire a license to drive will be used for an alternative purpose is not unreasonable.[7] To lessen legitimate fears in order to reduce the

---

[7] *See, e.g.*, Kimberly Cataudella & Alexia Fernández Campbell, Ctr. for Public Integrity, *Undocumented Immigrants Can Get Licenses. ICE Can Get Their Data* (July 13, 2021), https://publicintegrity.org/inequality-poverty-opportunity/immigration/undocumented-immigrants-licenses-ice-data/; McKenzie Funk, *How ICE Picks Its Targets in the Surveillance Age*, N.Y. Times Magazine (Updated Oct. 3, 2019), https://www.nytimes.com/2019/10/02/magazine/ice-surveillance-deportation.html; Jack Herrera, *DMV Employees Have Been Accused of Collaborating with ICE. This isn't the First Time*, Pacific Standard (July 8, 2019), https://psmag.com/news/dmv-employees-have-been-accused-of-collaborating-with-ice-this-isnt-the-first-time/ (reporting on how ICE turned states' driver's license databases into catalogs for facial image recognition to acquire information of undocumented immigrants who obtained driver's licenses under Vermont's equivalent of the Act); Drew Harwell, *FBI, ICE Find State Driver's License Photos Are A Gold Mine for Facial-Recognition Searches*, Washington Post (July 7, 2019), https://www.washingtonpost.com/technology/2019/07/07/fbi-ice-find-state-drivers-license-photos-are-gold-mine-facial-recognition-searches/ ("'The state has told [undocumented immigrants], has encouraged them, to submit that information. To me, it's an insane breach of trust to then turn around and allow ICE access to that,' said Clare Garvie, a senior associate with the Georgetown Law center who led the research.").

number of unlicensed, uninsured drivers on its roads,[8] thereby furthering the Act's objectives, the State Legislature provided the statutory privacy and notice protections outlined above regarding license-holders' data.

This understanding is reinforced by DMV on its website. *See* DMV, *Driver Licenses and the Green Light Law*, https://dmv.ny.gov/driver-license/driver-licenses-and-the-green-light-law (last visited Mar. 31, 2025) (Act "allows all New Yorkers age 16 and older to apply for a standard, not-for-federal purpose, non-commercial driver license or learner permit *regardless of their citizenship or lawful status in the United States*" and "does *not* provide a pathway to citizenship for applicants who are not already US citizens" (emphasis added)); DMV, *Resources for Non-US Citizens*, https://dmv.ny.gov/driver-license/resources-for-non-us-citizens (last visited Mar. 31, 2025) ("You do not need to be a US citizen to get a New York State driver license . . .").

The DMV website also clearly states that privacy protections exist for license-holders: "The law provides a number of privacy protections that limit data sharing, including to agencies that primarily enforce immigration laws, and requires disclosure to the license holders when immigration enforcement agencies request data from DMV." DMV, *Driver Licenses and the Green Light Law*, https://dmv.ny.gov/driver-license/driver-licenses-and-the-green-light-law (last visited Mar. 31, 2025); *see also, e.g.*, NYC Mayor's Office of Immigrant Affairs, *Driver's Licenses for All*, https://www.nyc.gov/assets/immigrants/downloads/pdf/drivers-licences-for-all.pdf (last visited Mar. 31, 2025) ("The new law specifically restricts access to DMV data by immigration enforcement agencies and prohibits anyone receiving DMV records or information from using that data for civil immigration enforcement purposes. ·Information like Social Security number, place of employment, or whether a driver's license is a REAL ID compliant license is protected.

---

[8] *See* State Br. at 1.

However, the law allows disclosure of information where required by an order from a judge. ·Keep in mind - some limited information (like your name and address) may not be protected."). Although these protections include the Subdivision 12 Provisions, they also include the other provisions—seemingly not challenged here—limiting access to Sensitive Information. Individuals reasonably relied on these assurances and statutory protections to provide information to the DMV.

For these license-holders, the standard license allows them to travel to their jobs, care for their minor children, attend to family medical needs, practice their religions, attend colleges and universities and engage in other daily activities for which a car is necessary.[9] As one license-holder recently told a reporter:

> Before the law, there was isolation. . . . As undocumented immigrants, licenses do not solve our lives but allow us to move and families appreciate that. . . . Having a license changed us[.] . . . For me personally, it allowed me to take my children to school, and their medical appointments, without the fear of being stopped by the police and asked for a license. . . . We pay to get licensed, and we buy, register, insure, and maintain the car. . . . Freedom of movement is a right. . . . I know a lot of people whose lives have changed. They used to go from home to work and then to the market every two weeks. Now they exercise, go out, and are integrated into the community.

Parra, *supra* n.4.

## ARGUMENT

Statutes, as enacted, are presumptively constitutional. *See, e.g., Alaska Packers Ass'n v. Indus. Accident Comm'n of Cal.*, 294 U.S. 532, 543 (1935) (discussing "presumption of constitutionality which attaches to every state statute"). The power to determine whether a statute is constitutional resides exclusively with the courts; individuals are neither required—nor

---

[9] In 2020, RMM, New York Immigration Coalition, Hispanic Federation and Neighbors Link Inc. submitted an *amicus* brief regarding the Act. *See Kearns v. Cuomo*, No. 19-3769-cv (2d Cir.), Dkt. No. 58 ("Kearns *Amici* Br."). The Kearns *Amici* Br. outlined the Act, the importance of its protections against the disclosure of information and specific examples why individual New Yorkers wanted a standard license.

empowered—to determine the validity of the law.  *See, e.g.*, *Perlstein v. Wolk*, 844 N.E.2d 923, 929 (Ill. 2006) (describing the "intolerable burden" that would otherwise be placed on citizens) (quotation marks and citation omitted); *see also Calverton Manor, LLC v. Town of Riverhead*, 75 N.Y.S.3d 586, 590-91 (2d Dep't 2018) ("Legislative enactments are entitled to an 'exceedingly strong presumption of constitutionality.'") (quoting *Nicholson v. Incorporated Vil. of Garden City*, 978 N.Y.S.2d 288, 289-90 (2d Dep't 2013)).  Those subject to a statutory scheme therefore have no choice but to rely on presumptively valid statutes "in making decisions and in shaping their conduct" in their daily lives.  *Lemon v. Kurtzman*, 411 U.S. 192, 199 (1973).

Here, license-holders relied—*for the past five years*—on the New York State statutory scheme.  It was not for these individuals to determine whether there was a conflict between the Federal Government and the State Government in relation to all or part of the Act.  As Defendants point out, privacy protections for records submitted to government agencies are not unusual.  *See* State Br. at 12-13.  Nor is it unusual for there to be limits on how data can be used when submitted for a limited purpose.  *See, e.g.*, *Amer. Fed. of Teachers v. Bessent*, -- F. Supp. 3d -- , 2025 WL 582063, at *7 (D. Md. Feb. 24, 2025) (recognizing, in another context, that plaintiffs "have a privacy interest in restricting access to their personal information to government employees properly authorized to access it"); *cf., e.g.*, *U.S. Dep't of State v. Ray*, 502 U.S. 164, 177 (1991) (emphasizing in FOIA case that "the interviews had been conducted pursuant to an assurance of confidentiality. . . .  [S]uch a promise does not necessarily prohibit disclosure, but it has a special significance in this case.  Not only is it apparent that an interviewee who had been given such an assurance might have been willing to discuss private matters that he or she would not otherwise expose to the public—and therefore would regard a subsequent interview by a third party armed with that information as a special affront to his or her privacy—but, as discussed above, it is also

true that the risk of mistreatment gives this group of interviewees an additional interest in assuring that their anonymity is maintained.").  Certain federal, state and local statutory or regulatory schemes also limit the ability of governmental actors to inquire into immigration status, or to use or disclose information submitted for one purpose for a separate enforcement purpose, where citizenship or lawful presence may be irrelevant to the original purpose.[10]

The license-holders presented acceptable proofs of identity and age to the DMV, and met State criteria to drive.  These criteria did *not* require proof or representation of lawful presence in the country or representations about immigration or citizenship status.  The State statutorily assured these standard license-holders that (i) application forms would not state *anything* about their citizenship or immigration status, *see* N.Y. Veh. & Traf. § 502(8)(c)(iii); (ii) the license would *not* be evidence of immigration or citizenship status, *see id.* at § 502(e); and (iii) privacy protections were in place for records and information submitted to the State for the limited purpose of acquiring the standard license, *including but not limited to* immigration enforcement agency information requests, *see generally id.* at § 201.  The State also statutorily vowed to provide

---

[10] *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 8, § 100.2(y)(3)(i)(a) (prohibiting New York public schools from asking for anything that would tend to reveal immigration status of child or child's parents); New York Executive Order No. 170, *State Policy Concerning Immigrant Access to State Services* (Sept. 15, 2017), https://www.governor.ny.gov/sites/default/files/atoms/files/EO%20%23170.pdf *extended by* New York Executive Order No. 6.1, *Continuation of Prior Executive Orders* (Jan. 16, 2025), https://www.governor.ny.gov/sites/default/files/2025-01/executive-order_6.1.pdf (prohibiting, *inter alia*, State law enforcement from inquiring about individual's immigration status unless relevant to illegal activity under investigation); Healthcare.gov, *Immigrants*, https://www.healthcare.gov/immigrants/immigration-status/ (last visited Mar. 31, 2025) ("We **only** use your information about immigration status to check if you qualify for Marketplace coverage.  We don't use it for immigration enforcement.") (emphasis in original); *see also, e.g.*, *Amer. Fed. of Teachers*, 2025 WL 582063 at *6 (discussing how federal Privacy Act's purposes "included "prevent[ing] the kind of illegal, unwise, overbroad, investigation and record surveillance of law abiding citizens produced in recent years from actions of some overzealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies."  *Doe v. DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985) (quoting S. Rep. No. 1183, 93d Cong., 2d Sess. 1 (1974)).").

license-holders notice within three days if their information was requested, via court order or judicial warrant, from an agency that primarily enforces immigration laws.  Although the State made certain amendments to the Act since 2019, it has *not* changed these fundamental protections. Standard license-holders' information will be kept private unless *specific* exceptions apply, and they will be notified if their information would be disclosed for immigration enforcement purposes.  Individuals relied on these assurances.

For example, back in 2020, *amici* RMM collected anecdotes from its staffers who accompanied individuals applying for licenses in several rural geographic regions after the Green Light Law went into effect.  *See* Kearns *Amici* Br. at 18-20.  One chronicle involved a naturalized female citizen with two young children and an undocumented male partner.  At the time, her partner was applying for a license, providing her with peace of mind about his ability to drive on the roads when her children were in the car, especially if they were to be stopped by the police. She looked forward to the assistance her partner would offer once he acquired the license, including in caring for their children and picking up necessary medication and food for their family.  Presumably, that peace of mind would be stripped if a standard license heightened the risk of immigration enforcement.

Nevertheless, Plaintiff asserts that it is unconstitutional under the Supremacy Clause to require immigration enforcement agencies to have a court order or warrant before gaining access to information held by the DMV or to otherwise limit its ability to gain immediate access to Sensitive Information.  *See generally* Compl.  But there are desirable State public policy and police power goals in providing individuals access to services and benefits that have absolutely nothing to do with immigration.  *See generally* State Br.  And the State achieved its legislative policy goals as thousands of New Yorkers reportedly now hold standard licenses.

The sweeping remedy Plaintiff seeks, if granted (which it should not be), would change the statutory scheme and eliminate statutory protections for these license-holders. It would convert an application or renewal for a standard license into an application with clear immigration implications, which it never was supposed to have. The bell cannot be unrung; these individuals cannot claw their data back, and their data, to the extent it is currently stored in the DMV's systems, could be subject to immediate access by immigration enforcement. This unfairly operates to expose license-holders, who simply sought the opportunity to drive, to the disclosure of their information without their consent or without the required process (*i.e.*, a subpoena, warrant, or court order unless a limited exception applies). To ignore the impact that the privacy protections have for license-holders is to override the determination by the State Legislature about how to exercise its police powers and the statutory protections it provided to the individuals.

## CONCLUSION

The Court should grant Defendants' motion to dismiss. Should the Court decide otherwise, which respectfully it should not, the interests of these individual license-holders should be taken into account as the case moves forward.

Dated:     New York, New York
               April 1, 2025

RURAL AND MIGRANT MINISTRY, INC.,
NEW YORK IMMIGRANT COALITION,
HISPANIC FEDERATION, LATINOJUSTICE
PRLDEF AND MAKE THE ROAD NEW YORK

*By their attorneys,*
By:     /s/ Kathleen A. Reilly
               Kathleen A. Reilly (NDNY Bar No. 303039)
               Arnold & Porter Kaye Scholer LLP
               250 West 55th Street
               New York, NY 10019-9710
               Telephone: 212.836.8000
               Fax: 212.836.8689
               kathleen.reilly@arnoldporter.com

-12-

Michael J. Sebba (NDNY Bar No. 701344)
Arnold & Porter Kaye Scholer LLP
777 South Figueroa Street, 44th Fl.
Los Angeles, CA 90017-5844
Telephone: 213.243.4000
Fax: 213.243.4199
michael.sebba@arnoldporter.com

Francisca D. Fajana (NDNY Bar No. 706292)
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: 212.219.3360
FFajana@latinojustice.org

<u>**EXHIBIT A: IDENTITY AND INTEREST OF *AMICI CURIAE***</u>
<u>**AND LOCAL CIVIL RULE 7.2(d) STATEMENT**</u>

**Rural and Migrant Ministry ("RMM")**.  RMM is a nonprofit organization that provides programs and services to immigrant and rural communities in Suffolk, Putnam, Orange, Ulster, Dutchess, Columbia, Sullivan, Wayne, Monroe, Orleans, Cayuga, Yates, Ontario, Genessee, Livingston, Erie, and Seneca Counties.  In support of the Act, RMM ran a grassroots campaign and met with legislative offices and local officials to help bring about the successful passage of the law.  Additionally, RMM has historically provided transportation services to individuals in these rural communities who are now eligible for or have already acquired a license pursuant to the Act.  Moreover, after the Act's passage, RMM collected anecdotes from its staffers who accompanied individuals applying for licenses in several rural geographic regions.  *See Kearns v. Cuomo*, No. 19-3769-cv (2d Cir.), Dkt. No. 58 ("Kearns *Amici* Br.") at 18-19.  It therefore has insights into the interests of the individual license-holders.

Specifically, the Act has changed lives in the migrant rural community.  Rural workers perform essential work throughout New York State.  The law has permitted the rural community to take their children to school and to access healthcare facilities, as well as to shop for food, drive to work and engage in any other life necessities.  The Act has also allowed members of this community to educate themselves on the rules of road, which in turn has a direct correlation to safer roadways, and increased the feasibility of individuals obtaining automobile insurance as required by law.  For the young rural driver, the Act has reduced the need to rely on limited or non-existent public transportation or on family members who are unable to drive them to facilities of higher education.  Furthermore and importantly, the Act allows migrants to obtain government-issued identification, which is often critical in obtaining other public and private services.

**New York Immigration Coalition (the "NYIC")**. The NYIC is an umbrella policy and advocacy organization for more than 170 immigrant community-based groups in New York, representing the collective interests of approximately four million New Yorkers. In 2016, the NYIC launched a statewide coalition to advocate for driver's licenses for all New Yorkers, irrespective of immigration status, because it was a top priority for its membership. As part of its advocacy efforts, and prior to the passage of the Act, the NYIC devoted substantial resources to support grassroots groups in immigrant communities to advocate for the Act. The NYIC has continued its advocacy in support of the Act since its passage and has devoted considerable resources to communication, programming, and education so that individuals have the knowledge and means to obtain a driver's license under the Act. *See, e.g.*, New York Immigration Coalition, *All New Yorkers Will Have a Green light to Drive Beginning December 16* (Dec. 9, 2019), https://www.nyic.org/2019/12/all-new-yorkers-will-have-a-green-light-to-drive-beginning-december-16/.

The NYIC has seen how the Act has allowed immigrant New Yorkers to meet their basic daily needs while resulting in economic and safety benefits for all New Yorkers. New York's roads are safer as licensing ensures that immigrants are informed of traffic laws and pass a standard driving test before being granted a license. Economic benefits directly flow from immigrants buying and leasing cars, as well as license and registration fees. Importantly, having a government-issued identification allows immigrants to meaningfully interact with New York state institutions, improving trust and cooperation. This includes being able to provide verifiable identification in case of interaction with law enforcement. For the newest immigrant New Yorkers, having a license streamlines the pathway towards family and economic stability. Many have found work in food delivery and other employment directly tied to having a license. The NYIC's work has allowed it

-b-

to see how reducing the barriers to licensing has allowed for fuller social and economic integration of immigrant New Yorkers, and safer roads and communities for all.

**Hispanic Federation ("HF").**  HF is a nonprofit member organization that works to empower and advance the Hispanic community through public policy advocacy, leadership development, and community revitalization.  HF also deployed a public education and media campaign aimed at educating immigrant communities about the Act, particularly in rural communities where public transportation is sparse.  HF, in support of the Act, produced policy papers, including a memorandum explaining the benefits of the Act.  HF also joined the Kearns *Amici* Br.

**LatinoJustice PRLDEF.**  Founded in 1972, LatinoJustice PRLDEF's mission is to use and challenge laws to create a more just and equitable society, transform harmful systems, empower Latino communities, fight for racial justice, and grow the next generation of leaders.  For over fifty years, LatinoJustice has litigated landmark cases and advanced policy reforms in areas of practice, including economic justice, and immigrants' rights.  LatinoJustice has filed and participated in hundreds of briefs in support of equal opportunity, including in serving as counsel to the *amici* participating in the Kearns *Amici* Br.

**Make the Road New York ("MTRNY")**.  MTRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods.  MTRNY has over 200 staff, over 28,000 members, and five offices spread throughout New York City, Long Island and Westchester.  MTRNY is at the forefront of numerous initiatives to improve civil and human rights for immigrant communities and was a leading advocate for the Act in the State Legislature, mobilizing its staff and members

to travel to Albany and speak with legislators on numerous occasions. After the Act's passage, MTRNY continued to advocate with State officials around implementation and conducted extensive public outreach and education, hosting information sessions in its offices; accompanying community members to DMV offices and fielding questions.

This brief was principally authored by LatinoJustice PRLDEF, along with counsel for *amici*, Arnold & Porter Kaye Scholer LLP. No party's counsel authored this brief in whole or in part. No party nor any party's counsel contributed money related to the preparation or submission of this brief. No person other than *Amici*, their members and their counsel contributed money related to the preparation or submission of this brief.

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


Dated: April 1, 2025                                    */s/ Kathleen A. Reilly*