**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**(Albany Division)**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETITIA A. JAMES, Attorney General of New York, in her Official Capacity; MARK J.F. SCHROEDER, Commissioner of the New York State Department of Motor Vehicles, in his Official Capacity. | No. 1:25-cv-205-AMN-MJK |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………...1

BACKGROUND……………………………………………………………………………2

   I.   Federal Immigration Law……………………………………………………………2

   II.  New York's Green Light Law……………………………………………………………3

   III. Procedural History……………………………………………………………………6

LEGAL STANDARDS………………………………………………………………………6

ARGUMENT ...................................................................................................... 7

   I.   The Challenged Provisions of the Green Light Law Violate the Supremacy Clause……..7

     A.    The Information-Sharing Restriction and Certification Requirement are
Expressly Preempted by the INA…………………………………………………………7

         1.   Section 1373(a) Preempts New York From Restricting Federal
Immigration Authorities' Access to DMV Information ............................. 8

         2.   Second Circuit Precedent Forecloses Defendants' Tenth
Amendment Challenge to Section 1373(a) ................................................. 9

     B.    The Challenged Provisions are Conflict Preempted by the INA………………..11

         1.   The Challenged Provisions Conflict with Federal Immigration Law....... 13

         2.   Defendants' Conduct is Not Sanctioned by the Tenth Amendment.......... 16

     C.    The Challenged Provisions Violate Intergovernmental Immunity Principles…...17

         1.   The Challenged Provisions Unconstitutionally Regulate the
Federal Government................................................................................... 18

         2.   The Challenged Provisions Unconstitutionally Discriminate
Against the Federal Government ............................................................... 21

   II.  The Proper Defendants are Named in this Suit……………………………………..24

CONCLUSION...................................................................................... 25

# TABLE OF AUTHORITES

**Cases**

*Anderson v. La Junta State Bank*,
115 F.3d 756 (10th Cir. 1997) ............................................................ 14

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................... 6, 7

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................................... *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 6

*Buckman Co. v. Pls.' Legal Comm.*,
531 U.S. 341 (2001) ...................................................................... 11

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ......................................................... 9-10, 13

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ...................................................................... 11

*Cunningham v. Neagle*,
135 U.S. 1 (1890) ..................................................................... 18, 19

*Davis v. Elmira Sav. Bank*,
161 U.S. 275 (1896) ...................................................................... 11

*Dawson v. Steager*,
586 U.S. 171 (2019) .................................................................. 22, 24

*Franks v. Delaware*,
438 U.S. 154 (1978) ...................................................................... 13

*Gade v. Nat'l Solid Wastes Mgm. Ass'n*,
505 U.S. 88 (1992) .................................................................. 12, 14

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ............................................................ 21

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ...................................................................... 11

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981) .................................................................................. 17

*Hohman v. Eadie*,
  894 F.3d 776 (6th Cir. 2018) ..................................................................... 14

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) .................................................................................. 12

*In re Dairy Mart Convenience Stores, Inc.*,
  411 F.3d 367 (2d Cir. 2005) ...................................................................... 25

*In re Grand Jury Subpoena Subpoena to Facebook*,
  2016 WL 9274455 (E.D.N.Y. May 12, 2016) ............................................ 14

*Johnson v. Maryland*,
  254 U.S. 51 (1920) ..................................................................................... 19

*Kearns v. Cuomo*,
  981 F.3d 200 (2d Cir. 2020) ...................................................................... 13

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ..................................................................................... 8

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956) ................................................................................... 20

*Loughrin* v. *United States*,
  573 U.S. 351 (2014) ..................................................................................... 8

*Mayo v. United States*,
  319 U.S. 441 (1943) ................................................................................... 18

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 136 (1819) ........................................................ 17, 18, 20

*McHenry Cnty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) ...................................................................... 21

*Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*,
  467 U.S. 461 (1984) ................................................................................... 12

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ..................................................................................... 7

*Murphy v. Nat'l Coll. Athletic Ass'n*,
  584 U.S. 453 (2018) ............................................................ 10, 16, 17

*National Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) ................................................................. 15, 17

*New York v. Dep't of Just.*,
  951 F.3d 84 (2d Cir. 2020) ........................................................ 10, 11

*New York v. Tanella*,
  374 F.3d 141 (2d Cir. 2004) ............................................................ 19

*North Dakota v. United States*,
  495 U.S. 423 (1990) ................................................... 17, 18, 21, 22

*Pennsylvania v. West Virginia*,
  262 U.S. 623 (1923) ........................................................................ 24

*Pharaohs GC Inc. v. SBA*,
  990 F.3d 217 (2d Cir. 2021) ........................................................... 23

*Printz v. United States*,
  521 U.S. 898 (1997) ..................................................... 10, 11, 16

*Reno v. Condon*,
  528 U.S. 141 (2000) ........................................................................ 11

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) .......................................................................... 24

*Tennessee v. Davis*,
  100 U.S. 257 (1879) ........................................................................ 19

*Trump v. Vance*,
  591 U.S. 786 (2020) ........................................................................ 18

*United States v. Alabama*,
  443 F. App'x 411 (11th Cir. 2011) ................................................ 25

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ..................................................... 12

*United States v. City of Arcata*,
  629 F.3d 986 (9th Cir. 2010) .................................................. 19, 24

*United States v. Ferrara*,
   847 F. Supp. 964 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995)......................................18

*United States v. King Cnty.*,
   122 F.4th 740 (9th Cir. 2024) ......................................................................................21, 22

*United States v. Locke*,
   529 U.S. 89 (2000) ......................................................................................................12

*United States v. Louisiana*,
   340 U.S. 899 (1950) ....................................................................................................25

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) ......................................................................................12

*United States v. Taylor*,
   596 U.S. 845 (2022) ....................................................................................................23

*United States v. Texas*,
   340 U.S. 900 (1950) ....................................................................................................25

*United States v. Washington*,
   596 U.S. 832 (2022) ................................................................................................21, 22

*Washington v. United States*,
   460 U.S. 536 (1983) ....................................................................................................21

*Wisc. Dep't of Indus. v. Gould Inc.*,
   475 U.S. 282 (1986) ................................................................................................12, 23

**Constitutional Provisions**

U.S. Const. art. I § 8, cl. 4............................................................................................2

U.S. Const. art. VI, cl. 2 ..............................................................................................7

**Statutes**

6 U.S.C. § 482..........................................................................................................16, 19

8 U.S.C. § 1101 *et seq*................................................................................................2

8 U.S.C. § 1125 ..........................................................................................................2

8 U.S.C. § 1126 ..........................................................................................................2

8 U.S.C. § 1127 ..........................................................................................................2

8 U.S.C. § 1128 ................................................................................................................ 2

8 U.S.C. § 1182 ................................................................................................................ 2

8 U.S.C. § 1226 ......................................................................................................... 3, 17

8 U.S.C. § 1227 ................................................................................................................ 9

8 U.S.C. § 1231 ............................................................................................................ 2, 3

8 U.S.C. § 1305 ................................................................................................................ 9

8 U.S.C. § 1306 ................................................................................................................ 9

8 U.S.C. § 1324 .............................................................................................................. 13

8 U.S.C. § 1357 ..................................................................................................... 2, 3, 13

8 U.S.C. § 1373 ....................................................................................................... *passim*

8 U.S.C. § 1644 ........................................................................................................ 3, 13

12 U.S.C. § 3401–22 ...................................................................................................... 14

18 U.S.C. § 2701 *et seq* ............................................................................................... 14

18 U.S.C. § 2703 ............................................................................................................ 14

Ch. 37, 2019 N.Y. Laws .................................................................................................. 3

N.Y. Penal Code § 70.00 ................................................................................................. 5

N.Y. Penal Code § 80.00 ................................................................................................. 5

N.Y. Veh. & Traf. § 201.1 ............................................................................................... 5

N.Y. Veh. & Traf. § 201.8 ............................................................................. 5, 9, 22, 23

N.Y. Veh. & Traf. § 201.10 ............................................................................................. 5

N.Y. Veh. & Traf. § 201.12 ..................................................................................... *passim*

N.Y. Veh. & Traf. § 502 ............................................................................................... 4, 5

**Rules**

Federal Rule of Civil Procedure 12 ................................................................ 6

Federal Rule of Civil Procedure 56 ............................................................. 2, 6

Local Rule 7.1 ................................................................................................ 6

**Regulations**

8 C.F.R. § 274a.12 ........................................................................................ 9

**Other Authorities**

DHS, Trusted Traveler Programs, https://ttp.dhs.gov/ .................................. 5

H.R. Conf. Rep. No. 104-725 ....................................................................... 8

N.Y. Dep't of Motor Vehicles, How to Apply for a New York: Learner Permit, Driver License, Non-Driver ID Card, https://dmv.ny.gov/forms/id44.pdf .......................... 9

Press Release, Letitia James, Attorney General James' Statement On Green Light Bill (June 17, 2019), https://ag.ny.gov/press-release/2019/attorney-general-james-statement-green-light-bill ............................................................... 25

Renee Anderson & Alice Gainer, New York's Green Light Law Hit With Dep't of Just. Lawsuit, Here's Why, CBS News (Feb. 13, 2025), https://www.cbsnews.com/newyork/news/pam-bondi-sues-ny-green-light-law/. .................................................... 25

S. Rep. No. 104-249 (1996) ......................................................................... 8

## INTRODUCTION

The Federal Government has "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). The immigration framework, established by Congress and administered by federal agencies, reflects a careful balance of law enforcement, foreign affairs, and public safety concerns—concerns that belong to the Nation as a whole, not a single state. That framework accordingly does not permit a patchwork of state and local policies that attempt to set their own rules for the implementation of federal immigration laws. Although a state may regulate legitimate areas of local concern, it may not do so in a manner that undermines the operations of the Federal Government. The State of New York has crossed this constitutional line yet seeks dismissal of this action challenging its conduct. The Court should deny that request and instead enter summary judgment in the United States' favor.

In acknowledged disagreement with the Federal Government's immigration policies, New York enacted the "Green Light Law," which prohibits the sharing of "records or information" maintained by the State's Department of Motor Vehicles ("DMV") with federal immigration authorities. *See* N.Y. Veh. & Traf. Law § 201.12(a)-(c). The law remarkably goes as far as directing Defendant DMV Commissioner to promptly tip off an illegal alien when a federal immigration agent asks the DMV for the alien's information. *See id.* § 201.12(a). It also requires anyone, including federal officers, who has access to or receives DMV materials to i) certify that they will not use such materials for civil immigration purposes or share them with federal immigration agencies; and ii) keep records over a five-year period detailing how the DMV materials were used and identifying any federal immigration official or agency that received them. *See id.* § 201.12(b). Violations of these certification and record-keeping requirements are punishable as felonies. *See id.* § 201.12(b), (c).

These provisions are facially invalid under the Supremacy Clause for at least four reasons. *First*, the information-sharing restriction and certification requirement are expressly preempted because they foreclose activity that is authorized under 8 U.S.C. § 1373(a). Second, all the challenged provisions are conflict preempted by the Immigration and Nationality Act because they

have the purpose and effect of thwarting federal immigration operations.  *Third*, all the challenged provisions unconstitutionally regulate federal officials in the performance of their duties, thereby violating intergovernmental immunity principles.  And *fourth*, those provisions alternatively violate intergovernmental immunity principles by discriminating against the Federal Government.

These facial claims are appropriately resolved through a motion for summary judgment, as there are no material facts in dispute and the Government is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  Accordingly, the Court should deny Defendants' motion to dismiss, enter summary judgment in favor of the United States, declare the Green Light Law unconstitutional, and enjoin Defendants from enforcing it.

## BACKGROUND

### I.    Federal Immigration Law

Setting immigration policy is the exclusive prerogative of the Federal Government.  *See* U.S. Const. art. I § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization").  Congress has thus made laws governing the entry, admission, presence, status, and removal of aliens within the United States through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and other related laws (*e.g.*, 6 U.S.C. § 482(b)(2)).  *See Arizona*, 567 U.S. at 396 ("Congress has specified which aliens may be removed from the United States and the procedures for doing so.").  These laws codify the Federal Government's authority to investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present in the United States.  *See* 8 U.S.C. §§ 1182, 1125-28, 1231, 1357.  Responsibility for enforcing these laws rests primarily with the U.S. Department of Homeland Security ("DHS") and two of its components—Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

In executing the immigration laws, federal immigration authorities rely on law enforcement partners in States and localities across the country.  *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system.").  Several provisions of the INA reflect that expectation of collaboration.  Most relevant here, 8 U.S.C. §

1373 seeks to ensure that no obstacles prevent the sharing of immigration-related information between federal, state, and local governments. Section 1373(a) thus provides that "State" and "local government entit[ies] or official[s] may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See* 8 U.S.C. § 1373(a). Similar provisions exist in Section 1373(b) and other statutes. *See id.* § 1373(b) ("[N]o person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorites "information regarding the immigration status, lawful or unlawful, of any individual."); *id.* § 1644 (similar); *see also id.* § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State[] to communicate with [federal immigration officials] regarding the immigration status of any individual"); *id.* § 1357(g)(10)(B) (providing that state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States").

In turn, Section 1373(c) provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *See id.* § 1373(c). The Federal Government is also responsible for making resources available to state and local authorities regarding whether individuals who have been arrested for aggravated felonies are aliens. *See id.* § 1226(d)(1)(A). And the Federal Government designates liaisons with States and localities in connection with aliens charged with aggravated felonies. *See id.* § 1226(d)(1)(B); *see id.* § 1226(c), 1231(a).

## II.     New York's Green Light Law

In 2019, New York enacted the "Green Light Law," which allows illegal aliens to obtain "standard" driver's licenses—i.e. licenses that are not for commercial driving or federal identification purposes. *See* Ch. 37, 2019 N.Y. Laws. The Green Light Law provides that proof

of lawful presence in the United States is not required to obtain a standard license in New York. *See* N.Y. Veh. & Traf. § 502(8)(b) & (e)(ii) ("GLL").  At the same time, the law imposes several prohibitions on the sharing of DMV materials with federal immigration authorites.

*First*, the Green Light Law prohibits the New York DMV Commissioner, as well as his or her agents or employees, from "disclos[ing] or mak[ing] accessible in any manner records or information that he or she maintains, to any agency that primarily enforces immigration law or to any employee or agent of such agency" absent a federal court order or warrant.  *Id.* § 201.12(a). The law defines the term "agency that primarily enforces immigration law" broadly to "include, but not be limited to" ICE and CBP, "and any successor agencies having similar duties."  *See id.* § 201.12(c).  This provision is referred to as the "information-sharing restriction" herein.

*Second*, the Green Light Law includes a tip-off mandate, where "[u]pon receiving a request for [] records or information from an agency that primarily enforces immigration law," the New York DMV "commissioner shall, no later than three days after such request, notify the individual about whom such information was requested, informing such individual of the request and the identity of the agency that made such request."  *Id.* § 201.12(a).  This provision is referred to as the "tip-off provision" herein.

*Third*, the Green Light Law requires that, before "any person or entity"—including any federal or state agency or official—may "receive[] or ha[ve] access to records or information from the [DMV]," such person or entity must "certify to the commissioner" that he or she "shall not (i) use such records or information for civil immigration purposes or (ii) disclose such records or information to any agency that primarily enforces immigration law or to any employee or agent of any such agency unless such disclosure is pursuant to a cooperative arrangement between city, state and federal agencies which arrangement does not enforce immigration law."  *Id.* § 201.12(b). This provision is referred to as the "certification requirement" herein.

*Fourth*, anyone subject to the certification requirement must retain for five years "records of all uses and identifying each person or entity that primarily enforces immigration law that received department records or information from such certifying person or entity" and must make

the records "available for inspection by the commissioner" upon request.  *Id.*  This provision is referred to as the "record-keeping requirement" herein.

*Finally*, violations of the certification and record-keeping requirements are punishable by the State of New York as a Class E felony, *see id.* § 201.12(b)-(c), which carries punishments of up to four years in prison and $5,000 in fines, *see* N.Y. Penal Code §§ 70.00(2)(e), 80.00(1)(a).

Each of the above provisions applies to "records or information" of any kind that are maintained by the New York DMV.  *See* GLL § 201.12(a)-(b).  Although New York law does not expressly define DMV "records or information," its broad scope, as evidenced by other laws, includes proof of "identity, age, and fitness," *id.* § 502(1); social security number or, for standard license applicants, an affidavit stating that the applicant does not have a social security number, *see id.*; "accident reports," "conviction certificates, police reports, complaints, satisfied judgment records, closed suspension and revocation orders, hearing records," *id.* § 201.1(i); as well as an applicant's photograph, "telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, [and] medical information or disability information," *id.* § 201.8.  Additionally, DMV information includes "record[s] that identif[y] whether the type of driver's license or learner's permit that a person holds either meets federal standards for identification or does not meet federal standards for identification."  *Id.* § 201.10.

The Green Light Law contains limited exceptions that allow DMV materials to be disclosed to federal immigraton agencies "as required for the commissioner to issue or renew a driver's license or learner's permit that meets federal standards for identification, as necessary for an individual seeking acceptance into a trusted traveler program, or to facilitate vehicle imports and/or exports[.]"  *Id.* § 201.12(a).[1]  In such cases, the restrictions above still apply—i.e. the DMV must

_____

[1] Trusted traveler programs include TSA Pre-Check, SENTRI, and other programs facilitating expedited international travel.  *See* DHS, Trusted Traveler Programs https://ttp.dhs.gov/.

tip off the subject of the request, and the recipient of the DMV information must follow the certification and record-keeping requirements under felony penalty.

### III.    Procedural History

On February 12, 2025, the United States filed this action against the State of New York and New York Governor Kathleen Hochul, New York Attorney General Letitia A. James, and New York DMV Commissioner Mark J.F Schroeder ("Defendants"), in their official capacities.  *See* Compl., ECF No. 1.  The Complaint alleges three claims under the Supremacy Clause:  preemption (Count One); unlawful regulation of the Federal Government (Count Two); and unlawful discrimination against the Federal Government (Count Three).  *See id.* ¶¶ 42-57.  The United States seeks declaratory and injunctive relief preventing Defendants from further enforcing the Green Light Law.  *See id.*, Prayer for Relief ¶¶ A-D.  On March 25, 2025, Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  *See* Mot. to Dismiss, ECF No. 10. The United States now files this consolidated memorandum opposing Defendants' motion to dismiss and supporting its motion for summary judgment.[2]

## LEGAL STANDARDS

To withstand a motion to dismiss under Rule 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[3]  The Court must accept as true all of the complaint's plausible factual allegations and construe all reasonable inferences in favor of the plaintiff.  *Id.*

Summary judgment is appropriate where the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[2] In accordance with Local Rule 7.1(c), the United States has consolidated into a single brief its opposition to Defendants' Motion to Dismiss and its Cross-Motion for Summary Judgment.
[3] Internal citations and quotations are omitted herein unless otherwise noted.

247-48 (1986) (emphases omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

## ARGUMENT

**I.    The Challenged Provisions of the Green Light Law Violate the Supremacy Clause**

The Supremacy Clause provides that federal laws are "the supreme Law of the Land[.]"  U.S. Const. art. VI, cl. 2.  The challenged provisions of the Green Light Law violate this principle on preemption and intergovernmental immunity grounds.  And contrary to Defendants' assertions, the Tenth Amendment confers no right on States to undermine, regulate, or discriminate against federal agents.  Because the Green Light Law does just that, as adequately alleged in the Complaint and as demonstrated as a matter of law herein, that law must be enjoined.

### A.    The Information-Sharing Restriction and Certification Requirement are Expressly Preempted by the INA

The provisions of the Green Light Law prohibiting the New York DMV from sharing records or information with federal immigration authorities, *see* GLL § 201.12(a), and extending that prohibition to any other person or entity that acquires New York DMV materials, *see id.* § 201.12(b), are expressly preempted by 8 U.S.C. § 1373(a).  Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area.  *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

Section 1373(a) provides that a "State . . . or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  There is no dispute that the information-sharing restriction and certification requirement are an effort by New York to restrict government entities—the New York DMV and any person or entity that receives or has access to New York DMV materials—from sending certain information to federal immigration authorities.  *See* GLL § 201.12(a), (b).  Instead, Defendants argue that Section 1373(a) does not apply to DMV records or information and further that Section 1373(a) is not a valid preemption provision under

the Tenth Amendment.  *See* Defs.' Mem. of Law ("Mem.") at 13-19, ECF No. 10-1.  Defendants are wrong on both points.

> **1.  Section 1373(a) Preempts New York From Restricting Federal Immigration Authorities' Access to DMV Information**

Section 1373(a)'s regulation of "information regarding [] citizenship or immigration status" is properly read to include DMV records and information.  *See* 8 U.S.C. § 1373(a).  Defendants interpret Section 1373(a) to apply only to "immigration status information," Mem. at 15, but that would read the word "regarding" out of the statutory phrase "information regarding [] citizenship or immigration status."  8 U.S.C. § 1373(a).  As the Supreme Court has explained, statutory terms like "regarding" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."  *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (citing authorities).  Reading the term "regarding" broadly is especially appropriate in this statutory context, because 8 U.S.C. § 1373(c)—unlike Section 1373(a)—refers only to "the citizenship or immigration status of any individual."  Congress' inclusion of "regarding" in Section 1373(a), juxtaposed with its omission of that term in an otherwise-parallel provision of the same statute, indicates that "Congress intended a difference in meaning."  *Loughrin* v. *United States*, 573 U.S. 351, 358 (2014).

The legislative history of Section 1373 confirms the scope of "regarding" here.  *See Arizona*, 567 U.S. at 405 (considering legislative history as part of a preemption analysis).  Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding *the presence, whereabouts, or activities of illegal aliens*," not merely their immigration status.  H.R. Conf. Rep. No. 104-725, at 383 (1996) (emphasis added); *see also* S. Rep. No. 104-249, at 19–20 (1996) ("The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is . . . of considerable assistance to . . . achieving of the purposes and objectives of the [INA].").  So too does the legislative history confirm that Section 1373 preempts laws that "in any way restrict[] any communication between State and local officials and [DHS]."  H.R. Rep. No. 104-725, at 383.

Defendants' contrary interpretation of Section 1373(a)—which relies solely on out-of-circuit, and thus non-binding, caselaw—is nonsensical.  *See* Mem. at 15.  The Federal Government is the predominant repository of immigration status information, which is why the INA requires federal immigration officials to provide that information to States upon request.  *See* 8 U.S.C. § 1373(c).  Defendants' interpretation would mean that Section 1373(a) pointlessly protects federal immigration officials' access to information that they already have.  By contrast, under a proper reading, Section 1373(a) allows those officials to receive information from States that is relevant in some way to immigration status, such as DMV information.  Consider, for instance, DMV records that contain contact information, including an individual's current home address.  *See, e.g.*, https://dmv.ny.gov/forms/id44.pdf, Section C (requiring applicants for permits and licenses to show proof of New York residence).  An alien's current address is closely related to immigration status because it reveals whether the alien has complied with the requirement to "notify the Attorney General in writing of each change of address and new address within ten days from the date of such change[.]"  8 U.S.C. § 1305.  Failure to comply with that provision is itself grounds for mandatory detention and removal, unless excused.  *See id.* § 1306; Compl. ¶ 38.  As another example, DMV records include an individual's "place of employment," *see* GLL § 201.8, which bears on an individual's immigration status because it reveals whether an alien has engaged in unauthorized employment or has stayed in the United States beyond his or her authorized period of admission.  *See* 8 U.S.C. § 1227(a)(1)(C); 8 C.F.R. § 274a.12.

For these reasons, Defendants' attempts to restrict federal immigration agencies' access to DMV information violate Section 1373(a), and those restrictions are thus preempted.

### 2. Second Circuit Precedent Forecloses Defendants' Tenth Amendment Challenge to Section 1373(a)

Defendants' Tenth Amendment challenge to Section 1373(a) fares no better, as the Second Circuit previously has rejected an analogous challenge.  In *City of New York v. United States*, a city ordinance restricted any "officer or employee from transmitting information regarding the immigration status of any individual to federal immigration authorities."  179 F.3d 29, 31 (2d Cir.

1999). Congress expressly preempted the ordinance in Section 1373(a), and the city alleged that Section 1373(a) violates the Tenth Amendment. *Id.* at 33. The court rejected that claim, explaining that Section 1373(a) "do[es] not directly compel states or localities to require or prohibit anything." *Id.* at 35. Instead, Section 1373(a) "prohibit[s] state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with the [Federal Government]." *Id.* (citing *Printz v. United States*, 521 U.S. 898, 917-18 (1997)). The court thus declined to convert "the Tenth Amendment's shield" into a "sword allowing states and localities to engage in passive resistance that frustrates federal programs." *Id.*; *see also id.* ("[S]tates do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs."). That principle applies with equal force here.

Defendants do not address *City of New York* and instead rely on cases from other circuits applying the Supreme Court's decision in *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). *See* Mem. at 18. But this Court is bound by the Second Circuit's ruling upholding Section 1373(a), *City of New York*, 179 F.3d at 35, which is consistent with *Murphy*. As the Supreme Court instructed in *Murphy*, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States" but in substance merely prevents the States from obstructing federal regulation of private parties. *See* 584 U.S. at 478. That understanding of preemption regards Section 1373(a), which "imposes restrictions . . . on private actors"—aliens—by facilitating the enforcement of federal laws against those actors. *See id.* at 477. Indeed, since *Murphy*, the Second Circuit has acknowledged that this "federal scheme . . . leaves room for a [State] policy *requiring* state officials to contact [federal immigration authorities] as a routine matter." *New York v. Dep't of Just.*, 951 F.3d 84, 114 (2d Cir. 2020) (emphasis in original) (quoting *Arizona*, 567 U.S. at 413).

Moreover, Defendants ignore the Supreme Court's recognition that information-reporting regulations do not have the same attendant Tenth Amendment concerns even though typically applicable to state and local governments. *See Printz*, 521 U.S. at 918 (distinguishing between

10

"the forced participation of the States' executive in the actual administration of a federal program," which constitutes impermissible commandeering, and "the provision of information to the Federal Government," which does not); *see also id.* at 936 (O'Connor, J., concurring) (citing a reporting requirement that applies only to state and local law-enforcement agencies); *Reno v. Condon*, 528 U.S. 141, 151 (2000) (the Constitution does not prohibit federal laws that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases"); *see also New York*, 951 F.3d at 112-14.

The United States' express preemption claim in Count One is thus sufficiently pled, and the United States is entitled to summary judgment on that claim.

### B.    The Challenged Provisions are Conflict Preempted by the INA

State laws cannot "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  Thus, state laws are invalid if they "either frustrate[] the purpose of the national legislation or impair[] the efficiency of th[o]se agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("If the purpose of the [federal law] cannot otherwise be accomplished – if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect – the state law must yield[.]").

Defendants try to dilute these principles at the threshold, arguing that a "presumption against preemption" applies because the Green Light Law's purpose is—purportedly—"the issuance of driver' licenses and the safety of [New York's] roads."  *See* Mem. at 8.  But the law's text belies those purported goals and makes clear its intent to enable illegal aliens to evade detection by federal immigration enforcement.  *See, e.g.*, GLL § 201.12(a) (requiring illegal aliens to be tipped off as to immigration officials' requests for information); *see also* Compl. ¶ 35 (quoting New York lawmakers' description of the law as shielding illegal aliens).  Because the law intends to regulate immigration activities, which are "inherently federal in character," *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347–48 (2001), the presumption invoked by Defendants does not

11

apply. *See United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government."); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (refusing to apply the presumption to a state law "constitut[ing] a thinly veiled attempt to regulate immigration under the guise of contract law," and thus "imping[ing] on an area of core federal concern"); *United States v. Locke*, 529 U.S. 89, 91 (2000) ("[A]n assumption of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").

Moreover, Defendants' characterization of the Green Light Law is irrelevant. In *Arizona*, the Supreme Court held that even state enactments intended to *help* enforce federal immigration law can be preempted. *See* 567 U.S. at 402 (state law preempted even if it purportedly shares "the same aim as federal law"). It follows *a fortiori* that the Green Light Law's effect of *thwarting* federal immigration enforcement is preempted, irrespective of any contrary intent asserted by Defendants. *See also Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 477 (1984) (state statute establishing association to represent agricultural producers is preempted notwithstanding that both it and the federal Agricultural Fair Practices Act "share the goal of augmenting the producer's bargaining power"); *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286–87 (1986) (similar). Indeed, to simply accept Defendants' stated purpose would be "at odds with the approach taken in nearly all [the Court's] Supremacy Clause cases" and "would enable state legislatures to nullify nearly all unwanted federal legislation by simply . . . articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992); *see also Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) ("[W]hen considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law."). Thus, whatever Defendants' intention may be with respect to

12

the Green Light Law, it is preempted because, as explained below, it disrupts federal enforcement of immigration laws.  *See* pp. 13-16, *infra*.

### 1. The Challenged Provisions Conflict with Federal Immigration Law

Congress, through the INA, established a comprehensive scheme by which the Federal Government regulates and enforces immigration law throughout the Nation.  *See* pp. 2-3, *supra*. That scheme hinges on coordination between federal, state, and local jurisdictions.  *See Arizona*, 567 U.S. at 394; *see also City of New York*, 179 F.3d at 35 ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system.").  Accordingly, that scheme contains provisions establishing a clear expectation of such coordination.  *See, e.g.*, 8 U.S.C. §§ 1373(a), 1373(b), 1644, 1357(g)(10)(A).  But the Green Light Law is expressly designed to interfere with that coordination, erecting significant obstacles to federal immigration officers' ability to access information necessary to carry out their duties.

*First*, and most egregiously, the Green Light Law directly interferes with federal law enforcement investigations by requiring Defendant DMV commissioner to tip off illegal aliens about a federal immigration agent's request for the alien's information.  *See* GLL § 201.12(a).  The tip off discloses to the alien both that the request was made to the DMV and the identity of the federal agency making the request.  *See id.*  For obvious reasons, notifying the subject of an investigation about that investigation's existence facilitates the subject's evasion of law enforcement.  *Cf. Franks v. Delaware*, 438 U.S. 154, 169 (1978) ("[T]he subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence.").  Moreover, under Second Circuit precedent, tipping off illegal aliens constitutes illegal harboring in violation of 8 U.S.C. § 1324.  *See Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities.").

Notwithstanding the constraints the tip-off provision places on federal investigations, Defendants assert that "individuals have a right to be notified when their personal information will

be disclosed to third parties." Mem. at 12. But none of Defendants' cited authorities supports this assertion where the disclosure would obstruct federal investigatory activities. Defendants invoke the Right to Financial Privacy Act, 12 U.S.C. § 3401–22, *see* Mem. at 12, which Congress enacted "in response to a pattern of government abuse in the area of individual privacy and was intended to protect the customers of financial institutions from unwarranted intrusion into their records[.] " *Anderson v. La Junta State Bank*, 115 F.3d 756, 758 (10th Cir. 1997); *see also Hohman v. Eadie*, 894 F.3d 776, 782 (6th Cir. 2018) (discussing the Right to Financial Privacy Act). That *Congress* chose to require disclosure of requests for certain information in a specific context (financial records) does not mean that *States* can unilaterally undermine the enforcement of federal law in an entirely separate context regarding entirely different information as here.

For the same reason, Defendants' reliance on the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*, Mem. at 12–13, is also misplaced. In enacting that Act, Congress chose in certain circumstances to require notification to customers or subscribers when providers of electronic communication services disclose the contents of a wire or electronic communication to the Federal Government. *See* 18 U.S.C. § 2703. Again, Congress's choice to require notification in an unrelated context, about unrelated information, does not give States free rein to do so in the immigration context, particularly where, as here, the notification is fundamentally at odds with Congressional design. *See Gade*, 505 U.S. at 98 (preemption asks whether the "state regulation is consistent with the structure and purpose of the [federal] statute as a whole"). Indeed, the Stored Communications Act itself provides that notification may be delayed where it would jeopardize an investigation. *See In re Grand Jury Subpoena to Facebook*, 2016 WL 9274455, at *4 (E.D.N.Y. May 12, 2016) (citing 18 U.S.C. § 2705).

Further undermining Defendants' suggestion that individuals have a right to know when their information "will be disclosed," *see* Mem. at 12, is that the Green Light Law ensures that information will *not* be disclosed to federal immigration authorities. *See* GLL § 201.12(a)-(c). Simultaneously alerting aliens to a request for their information while barring the disclosure of that information does not serve any purported privacy interest. Instead, the only apparent interest

14

served by the tip-off provision is New York's interest in facilitating the alien's evasion of federal immigration authorities.

*Second*, through its information-sharing restriction and its certification and record-keeping requirements, the Green Light Law interferes with "an important feature of the immigration system": the flow of information between federal, state, and local authorities. *See Arizona*, 567 U.S. at 411; *see also* 8 U.S.C. § 1373(a). Specifically, the information-sharing restriction prohibits the New York DMV from providing any of its records or information to federal immigration authorities. GLL § 201.12(a). And the certification and record-keeping requirements extend that prohibition to any recipient of New York DMV information—including employees of other States and even federal officers. *Id.* § 201.12(b). These provisions thus "substitute[] a new regulatory scheme for the one" Congress designed and are conflict preempted. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

The practical consequences of New York's obstruction are not theoretical. Because of the Green Light Law, federal agents lack access to information that is essential to their duties. For instance, ICE uses DMV information to "verify or corroborate an investigatory target's residential address, date of birth, height, weight, eye color, hair color, and facial features." *See* Decl. of Stephen J. Kurzdorfer ¶¶ 9, 15 ("Kurzdorfer Decl."); *see also* Decl. of John R. Modlin ¶ 9 ("Modlin Decl.") (describing CBP's use of DMV information to "validate individuals' identities")[4]; Compl. ¶ 39. Prior to the Green Light Law, ICE routinely used this information in New York to know for whom they were looking and where that person was likely to be found. *See* Kurzdorfer Decl. ¶¶ 14–15. Additionally, both ICE and CBP use DMV information to connect vehicle license plates with registered owners, whose real-time access is critical during vehicle traffic stops and border

---

[4]The United States submits declarations from ICE and CBP in support of its summary judgment arguments on its conflict preemption claim. The facts provided in those declarations are straightforward and indisputable; they are intended to exemplify the types of DMV information that federal agents rely on, and the ways in which Defendants have implemented their own policies. Still, the Court need not rely on the declarations in order to enter judgment in the United States' favor and may instead do so based on the predominating legal issues addressed herein.

crossings because it can lead to information showing whether the owner has arrest warrants, a suspended license, or if an officer lookout/safety alert has been placed on that owner. *See* Kurzdorfer Decl. ¶¶ 10, 17-20; *see also* Modlin Decl. ¶¶ 14, 18-22. Under the Green Light Law, the New York DMV does not provide ICE or CBP this information in these contexts. Kurzdorfer Decl. ¶¶ 16, 20-21; Modlin Decl. ¶¶ 14, 18. And the Green Light Law further prohibits any other person or entity that has the information, such as a state police department or even other federal agencies, from sharing it with ICE or CBP. *See* GLL § 201.12(b); Kurzdorfer Decl. ¶¶ 16-17; *contra* 6 U.S.C. § 482(b)(2) (requiring federal agencies to share homeland security information among themselves and with appropriate state and local personnel). The Green Light Law thus "places law enforcement officers at a tactical disadvantage," Kurzdorfer Decl. ¶ 19, and creates "operational gaps" denying them full visibility into the danger posed by individuals they encounter, Modlin Decl. ¶ 26; *see also id.* ¶¶ 14, 20, 25.

### 2.     Defendants' Conduct is Not Sanctioned by the Tenth Amendment

Defendants erroneously characterize their obstruction of federal immigration enforcement as their prerogative under the Tenth Amendment. *See* Mem. at 20–21. The anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program," or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz*, 521 U.S. at 935; *see also Murphy*, 584 U.S. at 473. But Defendants fail to identify any federal law that transgresses those limitations—i.e. that orders New York to adopt or implement a federal program. *Cf. Printz*, 521 U.S. at 903 (invalidating a federal law that required state officials to conduct background checks for firearm purchasers). The Federal Government has not suggested that it could compel New York's active participation in immigration enforcement but instead seeks to prevent New York from interfering with federal authorities so that *they* may enforce the immigration laws. And the Federal Government bears sole responsibility for its actions taken with respect to aliens pursuant to its regulatory authority. *Cf.* 8 U.S.C. § 1226(f) (allowing States to sue the Federal Government for decisions or failures with respect to the detention of aliens that cause harm to a State or its residents). Moreover, the Tenth Amendment is not implicated where, as here,

the Federal Government seeks to regulate private actors—a principle the Supreme Court has expressly declined to disturb. *See Murphy*, 584 U.S. at 476–77; *see also* p. 10, *supra*.

Defendants nonetheless assert that they are merely "refrain[ing] from" engaging in federal immigration enforcement pursuant to the Tenth Amendment. *See* Mem. at 21. But States may not escape preemption "just by framing" a law in an artful way. *Nat'l Meat Ass'n*, 565 U.S. at 464. As demonstrated, Defendants are not standing aside passively. They are actively thwarting immigration activities by not only refusing to themselves provide information to federal immigration authorities but prohibiting anyone else from doing so—even officials in other States or federal agencies who may wish to cooperate with the Federal Government. *See* Kurzdorfer Decl. ¶ 23. When a State's regulatory scheme collides with federal law in this fashion, the State law is preempted and the federal law prevails. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–90 (1981) (noting that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to preempt or displace state regulation of private activities . . . ."). Thus, if New York wants to issue driver's licenses to illegal aliens, it must do so in a way that does not frustrate federal activities. *See id.* at 290–91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role.").

In sum, under any plausible understanding of conflict preemption, the challenged provisions of the Green Light Law are unenforceable. Accordingly, Count One of the Complaint not only withstands dismissal, but the United States is entitled to summary judgment on that count.

C.    **The Challenged Provisions Violate Intergovernmental Immunity Principles**

 Each of the challenged provisions of the Green Light Law is alternatively invalid under the intergovernmental immunity doctrine. *See North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819)). A state law violates the United States' intergovernmental immunity if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *See id.* at 435. The challenged provisions of the Green Light Law do both.

17

### 1. The Challenged Provisions Unconstitutionally Regulate the Federal Government

It is well settled under the intergovernmental immunity doctrine that "the activities of the Federal Government are free from regulation by any state." *See Mayo v. United States*, 319 U.S. 441, 445 (1943); *see also McCulloch*, 17 U.S. (4 Wheat.) at 436 (States have no power to "in any manner control" the operations of the Federal Government); *Trump v. Vance*, 591 U.S. 786, 829-31 & n.5 (2020) (Alito, J., dissenting) (collecting cases showing that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers"). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

Applying these principles, the Green Light Law's certification and record-keeping requirements directly regulate the conduct of every federal official who receives or has access to New York DMV information. *See* GLL § 201.12(b). First, the certification requirement demands that anyone who receives or has access to such information—including federal immigration officials who obtain the information under one of the Law's narrow exceptions, *see id.* § 201.12(a), and federal officials who are not involved in immigration—must certify, under felony penalty, that they will not use the information for civil immigration purposes or disclose it to a federal immigration agency, *see id.* § 201.12(b). Thus, if CBP receives New York DMV information to process the exportation of a vehicle, the law nonetheless purports to criminally bar CBP personnel from sharing that information with ICE as an "entity that primarily enforces immigration law." *See id.* § 201.12(b); Compl. ¶ 34. Second, under the record-keeping requirement, anyone who obtains DMV information—again, including any federal officials—is required to "keep for a period of five years" records showing how the information was used and identifying "each person or entity that primarily enforces immigration law that received" the information. *See* GLL § 201.12(b).

18

These provisions directly regulate federal officials in the performance of their duties, dictating how they handle information, requiring them to take certifying and record-making actions that are inconsistent with their official responsibilities, and exposing them to criminal liability. Allowing States to regulate—or outright ban, as these provisions do—federal officials from using information in certain ways and from sharing information within the Federal Government, would give States the power to stymie federal operations. Federal agencies "need to be able to freely communicate to ensure that one [agency's] operation does not undercut another" operation and to "get[] the right information into the right hands timely." Compl. ¶ 41. Moreover, federal law requires federal agencies to share certain immigration information with each other (and with States) to assess and respond to threats of terrorist activity. *See* 6 U.S.C. § 482(b) (requiring the sharing of homeland security information between "Federal agencies and [with] appropriate State and local personnel").

The Constitution does not allow States to hamstring federal operations and jeopardize the security of the nation. *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920) (States cannot "control the conduct of individuals acting under and in pursuance of the laws of the United States"); *see also, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly."). Nor does the Constitution tolerate States chilling federal activities through criminally punishing federal officers for carrying out their lawful, and in some cases required, official activities. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (discussing federal officers' immunity from state prosecution); *Neagle*, 135 U.S. at 41 (finding state law displaced whenever it imposes intolerable burdens on a federal officer's attempts to protect federal interests or execute federal law); *Tennessee v. Davis*, 100 U.S. 257, 272-63 (1879) (highlighting the dangers of subjecting federal officers to state prosecutions).

The information-sharing restriction likewise regulates federal functions by requiring immigration officers to procure judicial warrants or orders to obtain information. *See* GLL § 201.12(a). But Congress has authorized federal officers to access immigration information from

States without those procedural constraints.  *See* 8 U.S.C. § 1373(a).  Put differently, whereas Congress has prohibited States from "in any way restrict[ing]" the sharing of immigration information—which includes DMV information, *see* pp. 8-9, *supra*—with federal immigration officials, 8 U.S.C. § 1373(a), the Green Light Law denies immigration officials that information unless they satisfy legal standards distinctly reserved for criminal judicial proceedings.  But States have no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer."  *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956).

Further, the tip-off provision regulates federal immigration officials by directly interfering with their investigative efforts, forcing them to choose between requesting information in support of an investigation and exposing that investigation to its target.  *See* GLL § 201.12(a).  This impermissibly "control[s]" the operations of federal investigators in violation of their intergovernmental immunity.  *See McCulloch*, 17 U.S. (4 Wheat.) at 436.

Defendants have no meaningful rebuttal to this straightforward application of intergovernmental immunity principles.  They assert that the information-sharing restriction and certification requirement are directed to the New York DMV and thus "do not govern the actions of any federal actors or entities."  *See* Mem. at 23.  That is both factually and legally wrong.  Those provisions, by their plain text, require that federal officials take certain actions to obtain information—i.e. "present [the DMV] with a lawful court order or judicial warrant," *see* GLL § 201.12(a), and certify that they will not use or share the information for immigration purposes, *see id.* § 201.12(b).  Indeed, Defendants acknowledge that the certification requirement "regulates the permissible uses and disclosures of the underlying information."  *See* Mem. at 23.  As discussed above, these requirements directly control the manner in which federal officials do their jobs.  *See United States v. King Cnty.*, 122 F.4th 740, 756 (9th Cir. 2024) (State law violates intergovernmental immunity where it "effectively grants [the state] the power to control" the Federal Government's "operations").

Defendants' reliance on the Seventh Circuit's opinion in *McHenry County* does not save them.  *See* Mem. at 23 (citing *McHenry Cnty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022)).  There,

the court rejected an intergovernmental immunity challenge to a state law prohibiting state and local entities from affirmatively entering into certain contracts with the Federal Government. *See McHenry Cnty.*, 44 F.4th at 593. The Green Light Law goes much further, requiring federal officials to take affirmative measures to ensure that information they receive from the DMV is not provided to federal immigration officials. Regardless, since *McHenry County*, courts have found that state laws improperly regulate the Federal Government even where they purport to operate against others. *See, e.g.*, *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (holding that California statute that phased out all private detention facilities within the State, as applied to ICE detention facilities operated by contractors, violated intergovernmental immunity); *King Cnty.*, 122 F.4th at 757 (finding unlawful regulation where a County Ordinance directed local officials to ensure that third-party operators who leased space from the County's airport did not service ICE charter flights).

For these reasons, Count Two of the Complaint not only withstands dismissal, but the United States is entitled to summary judgment on that count.

### 2. The Challenged Provisions Unconstitutionally Discriminate Against the Federal Government

Alternatively, the challenged provisions of the Green Light Law violate intergovernmental immunity principles because they discriminate against the Federal Government. A state may not "treat someone else better than it treats" the Federal Government—or even just a part of it. *See Washington v. United States*, 460 U.S. 536, 544-45 (1983); *North Dakota*, 495 U.S. at 434-36. That includes "singling out the Federal Government for unfavorable treatment," *United States v. Washington*, 596 U.S. 832, 839 (2022), or imposing any discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 171 (2019).[5] Courts presume that discriminatory state laws are invalid absent clear congressional authorization. *See Washington*, 596 U.S. at 839; s*ee also King Cnty.*, 122 F.4th at 757 (finding unlawful discrimination where a

---

[5] The principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434-39.

County Ordinance directed local officials to ensure that private operators who leased space from the County's airport did not service ICE charter flights).

The challenged provisions of the Green Light Law facially target federal immigration authorities, specifically ICE and CBP, in ways that do not apply to any other person or entity. The information-sharing restriction and certification requirement restrict the disclosure of DMV records or information to federal immigration authorities, and *only* such authorities. *See* GLL § 201.12(a)-(b). The tip-off provision requires the DMV to notify individuals when federal immigration authorities, and *only* such authorities, request its information. *See id.* And the record-keeping requirement mandates the tracking of federal immigration authorities, and *only* such authorities, who receive DMV materials. *See id.* Moreover, the certification and record-keeping requirements carry felony criminal penalties that only apply when information is disclosed to federal immigration authorities. *See id.* § 201.12(b)-(c). These provisions, individually and collectively, thus treat federal immigration authorities less favorably than any other user of DMV information—exactly what intergovernmental immunity principles forbid. *See Dawson*, 586 U.S. at 177. Defendants' arguments to the contrary are unavailing.

First, Defendants acknowledge that the information-sharing restriction "prohibits disclosure of DMV records and information to federal immigration officials," but they deny any discriminatory treatment because they claim that the law elsewhere "imposes a similar disclosure prohibition of non-public DMV information that applies to 'any request for records.'" *See* Mem. at 24 (quoting GLL § 201.8). To the extent Defendants assert that the same information is already protected from disclosure under another provision of the Green Light Law, that would render the information-sharing restriction superfluous, and make it unclear why the State so strenuously resists an injunction against it. That is, if Section 201.8 requires the DMV to deny "any request" for its information, there would be no reason for Section 201.12 to separately require the DMV to deny an immigration authority's request for that same information. But Section 201.12 does so, and thus that provision necessarily requires the DMV to refuse immigration authorities, and only those authorities, access to information beyond the information restricted by Section 201.8. *See*

22

*Pharaohs GC Inc. v. SBA*, 990 F.3d 217, 227 (2d Cir. 2021) ("A statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant."); *cf. United States v. Taylor*, 596 U.S. 845, 857 (2022) ("[W]e do not lightly assume Congress adopts two separate clauses in the same law to perform the same work."). A comparison of the two provisions supports this reading, as Section 201.12 prohibits the sharing of DMV "records or information" of any kind to immigration authorities, whereas Section 201.8 prohibits the sharing of only records that contain certain kinds of information and that "relate to a non-commercial driver's license or learner's permit application or renewal application." *Compare* GLL § 201.12, *with id.* § 201.8.

Second, Defendants argue that the certification requirement is "facially neutral" because it requires anyone, whether "a private business or a state, local, or federal agency" to provide the certification and to refrain "from using or disclosing the protected information for unauthorized purposes." *See* Mem. at 24. This misses the point. The certification requirement may apply to "any person or entity that receives or has access to" DMV materials, but it forbids such persons or entities from using those materials *only* "for civil immigration purposes" or from sharing those materials *only* with federal immigration agencies. GLL § 201.12(b); *see Wis. Dep't of Indus.*, 475 U.S. at 289 ("It is the conduct being regulated . . . that is the proper focus of concern."). Those who receive New York DMV materials remain free to use or share them for any other purpose. And they may do so without having to keep records of other recipients under the record-keeping requirement, GLL § 201.12(b), and without the DMV disclosing their requests for the information under the tip-off provision, *id.* § 201.12(a). This unquestionably "singles out" federal immigration activities for disfavored treatment. *See Dawson*, 586 U.S. at 178; *see also City of Arcata*, 629 F.3d at 991 ("The cities' differential treatment of identical conduct based on the actor's status as a federal agent or employee fits squarely within the [discrimination] framework."). Moreover, the law's discriminatory impact is further heightened by its felony penalties, which apply only in circumstances where information is used or disclosed for federal immigration purposes. *See* GLL § 201.12(b)-(c).

Finally, Defendants invoke anticommandeering principles in defense of the discrimination claim. *See* Mem. at 25. But Defendants cannot seriously contend that actively targeting federal immigration activity is protected conduct. Rather, as Defendants have chosen to restrict, monitor, and even criminally sanction the sharing of information with federal immigration officials, it is Defendants that are attempting to commandeer federal activity—not the other way around.

Accordingly, Count Three of the Complaint not only withstands dismissal, but the United States is entitled to summary judgment on that count.

## II.    The Proper Defendants are Named in this Suit

Defendants contend that the New York Governor and Attorney General are not proper parties to this suit. *See* Mem. at 25. The Court need not consider this argument because, even if the Governor and Attorney General were dismissed from this action, an injunction against the State of New York—which Defendants do not dispute is a proper party—would fully redress the United States' injuries. The Supreme Court has long recognized that "[t]he Federal Government can bring suit in federal court against a State" to "ensur[e] the State['s] compliance with federal law[.]" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 71 n.14 (1996). In cases where States are defendants, it is not unusual for a court to simply enjoin the State and leave it to the State to determine what actions should be taken by which state officers and agencies to achieve compliance. *See, e.g.*, *Pennsylvania v. West Virginia*, 262 U.S. 623, 624 (1923) (per curiam) (ordering "[t]hat the defendant state, and her several officers, agents and servants, are hereby severally enjoined from enforcing, or attempting to enforce" an unconstitutional law); *United States v. Alabama*, 443 F. App'x 411, 420 (11th Cir. 2011) (per curiam); *United States v. Texas*, 340 U.S. 900 (1950) (Mem.); *United States v. Louisiana*, 340 U.S. 899 (1950) (Mem.). Here, the Court could enjoin Defendant State of New York and its agents, officers, and employees from taking any measures to enforce the challenged provisions of the Green Light Law. Such an injunction would thus render moot Governor Hochul's and Attorney General James's concerns about whether they are proper parties.

If the Court reaches this issue, it should reject Defendants' arguments.  State officers may be sued in their official capacity if they have sufficient connection to the challenged law irrespective of whether the officer is expressly responsible for enforcing the law.  *See In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 373 (2d Cir. 2005).  Here, the Governor's and Attorney General's public statements indicate such connection to the Green Light Law.  For instance, in response to this suit, Governor Hochul stated: "[T]here's no way I'm letting federal agents . . . get unfettered access to the personal data of any New Yorker in the DMV system[.]"[6] She went on to say:  "Let me be clear: New York is not backing down." *Id.*  For her part, Attorney General James has "vow[ed] to defend" the Green Light Law in litigation since before the law was even enacted.[7]  In 2019, when the law was under consideration, Attorney General James stated:  "I support the Green Light bill. . . . If this bill is enacted and challenged in court, we will vigorously defend it." *Id.*  Accordingly, Governor Hochul and Attorney General James are proper defendants.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion to dismiss, grant the United States' motion for summary judgment, declare the challenged provisions of Green Light Law unconstitutional, and enjoin their enforcement by Defendants.

DATED: April 25, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General
                                         Civil Division

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director

---

[6] Renee Anderson & Alice Gainer, *New York's Green Light Law Hit With Dep't of Just. Lawsuit, Here's Why*, CBS News (Feb. 13, 2025), https://www.cbsnews.com/newyork/news/pam-bondi-sues-ny-green-light-law/.

[7] Press Release, Letitia James, *Attorney General James' Statement On Green Light Bill* (June 17, 2019), https://ag.ny.gov/press-release/2019/attorney-general-james-statement-green-light-bill.

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/Cristen C. Handley*
CRISTEN C. HANDLEY (MO Bar # 69114)
ELISABETH J. NEYLAN (NY Bar # 6125736)
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: 202-305-2677
Fax: 202-616-8460
E-mail: Cristen.Handley@usdoj.gov

*Attorneys for the United States*