**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

              Plaintiff,

v.

STATE OF NEW YORK, *et al.*,

              Defendants.

Case No. 1:25-cv-0205(AMN/MJK)

---

## *AMICUS CURIAE* BRIEF OF IMMIGRATION REFORM LAW INSTITUTE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Christopher J. Hajec
Gabriel R. Canaan
*Attorneys for Amicus Curiae*
Immigration Reform Law Institute
25 Massachusetts Ave. NW, Suite 335
Washington, D.C. 20001
Telephone: (202) 232-5590
chajec@irli.org
gcanaan@irli.org

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*………………………………………………………...1

INTRODUCTION………………………………………………………………………….1

ARGUMENT……………………………………………………………………………… 2

    I. The Green Light Law is conflict-obstacle preempted…………………………………3

    II. The Green Light Law is conflict-impossibility preempted……………………..…..6

    III. The Green Light Law is preempted by federal laws that occupy the field of regulating the admission and registration of aliens……..…………………………………..10

CONCLUSION…………………………………………………………………………...12

## INTEREST OF *AMICUS CURIAE*

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## INTRODUCTION

The "Green Light Law" was enacted in 2019 to permit those without lawful immigration status to obtain standard driver's licenses. Codified at N.Y. Veh. & Traf. Law § 201(12) and § 502(8), the law prohibits the Department of Motor Vehicles (DMV) from inquiring into an applicant's citizenship or immigration status and mandates acceptance of foreign documents as proof of identity. The law further restricts the disclosure of applicant information, barring the DMV from sharing data with federal immigration authorities absent a judicial warrant or court order, or unless expressly required by state or federal law. § 201.12(a). It also contains a tip-off provision that requires the DMV commissioner to notify any illegal alien upon a request for his or her information by federal immigration agents. § 201.12(b).

The Green Light Law Violates the Supremacy Clause of the U.S. Constitution in numerous ways. Because the Green Light Law both stands as an obstacle to the purposes of federal immigration law and commands state officials to violate federal criminal law, it is

1

conflict preempted. The Green Light Law is also field preempted, because it involves the state in registering aliens, a field Congress has occupied.

## ARGUMENT

The Constitution provides that "Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4. When read together with the Necessary and Proper clause, the Constitution grants Congress plenary power over the admittance of aliens into, and the conditions of their lawful presence in, the United States. *Id.* at cl. 18. The plenary power of Congress in this arena has long been affirmed by the Supreme Court. *See, e.g., De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("The supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution . . . ."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government.").

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, state laws may be preempted by federal law. Two kinds of preemption are conflict preemption and field preemption. A state statute is conflict preempted if compliance with both that statute and federal law is impossible. *E.g. Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). Also, a state law, including an immigration-related one, is conflict preempted if it "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *De Canas*, 424 U.S. at 363 (quoting *Hines*, 312 U.S. at 67). "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Gade v. Nat'l Solid*

*Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962))).

Field preemption occurs when state or local governments attempt to regulate in a field that Congress intends to occupy exclusively. *English v. Gen. Electric Co.*, 496 U.S. 72, 79 (1990) ("[S]tate law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."). Congress's intent to occupy a field can be inferred where a federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *Gade*, 505 U.S. at 98, or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). While Congress has never intended a "complete ouster of state power" from the immigration arena, *De Canas*, 424 U.S. at 357, some fields within that arena have been occupied by Congress, including that of alien registration. *Arizona v. United States*, 567 U.S. 387, 401 (2012) ("[T]he Federal Government has occupied the field of alien registration.").

### I.     The Green Light Law is conflict-obstacle preempted.

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has

resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

By design, the Green Light Law frustrates the Immigration and Nationality Act ("INA") in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal-state cooperation Congress intended to foster in that enforcement. The law prohibits DMV employees from sharing and "records or information" with any federal immigration agency absent a federal court order or judicial warrant, § 202.12(c). It also requires that anyone who can access or receive DMV "records or information" certify that it will not be used for civil immigration enforcement purposes. § 202.12(b).

As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRAIRA"), which includes 8 U.S.C. § 1373, Congress sought unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (1996). The Senate Judiciary Committee Report accompanying IIRAIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

4

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), *quoted in City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress sought to foster a cooperative effort among local, state, and federal law enforcement in the enforcement of immigration law.

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRAIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (1996) (PRWORA). Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," Section 434 of this law, now 8 U.S.C. § 1644, is nearly identical to § 1373. *Id.* This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRAIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing Section 434: to bar *any* restriction on State and local government entities in their communications with ICE, including about the *whereabouts* of illegal aliens, which obviously includes the time of their release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS.
>   The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law

> enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), *quoted in City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

The law frustrates, and is intended to frustrate, federal enforcement of immigration law. By design, the law keeps ICE in the dark about an individual's place of birth, country of origin, place of home and work addresses, place of employment, and other information of the kind contemplated by the PRWORA Conference Report, that ICE depends on to conduct enforcement operations. S. 1747, § 2(8). Because the Green Light Law by its terms, mandates noncooperation with federal enforcement of immigration laws, it thwarts the congressional purpose of fostering such cooperation.

## II. The Green Light Law is conflict-impossibility preempted.

In addition to being obstacle preempted, the Green Light Law requires that New York state employees violate the federal anti-harboring statute, section 274(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1324(a)(1)(A)(iii). Doc. No. 3-16 at ¶¶ 11–13. Second Circuit precedent takes a broad view of the criminal conduct subject to a felony conviction under this INA subsection. "Harboring" encompasses a "wide range of conduct" that tends

substantially to facilitate "an alien's remaining in the United States illegally." *United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999).

But the conflicts between the Green Light Law and 8 U.S.C. § 1324 are not limited to the anti-harboring provision. The anti-harboring provision is but one part of a comprehensive congressional sanction of 1) any act of knowingly assisting an alien who has not been inspected and admitted to come to, enter, travel in, or remain in the United States, or 2) any act of such assistance taken in reckless disregard of an alien's unlawful status. 8 U.S.C. § 1324(a)(1)(A). For example, criminal convictions can be obtained for inducing or encouraging an illegal alien to reside in the United States, § 1324(a)(1)(A)(iv); attempting to harbor or shield an illegal alien from detection while in "any means of transportation," § 1324(a)(1)(A)(iii); attempting to "move or transport" an illegal alien within the United States "by means of transportation or otherwise" in furtherance of the alien's illegal presence, § 1324(a)(1)(A)(ii); and aiding or abetting any of the preceding acts. § 1324(a)(1)(A)(v)(II).

Aliens aged 18 or older who lawfully remain in the United States will already possess and carry documentation of alien registration. *See* 8 U.S.C. § 1304(e). Thus, virtually every non-citizen driver's license applicant to whom the New York DMV issues a non-federally compliant license will have failed to present such documentation, DMV officials will be acting in reckless disregard of whether that applicant remains in the United States in violation of federal immigration law.

### A. *The Green Light Law directs state officials to commit criminal "inducement" under 8 U.S.C. § 1324(a)(1)(A)(iv).*

Any person who "encourages or induces" an alien to remain in the United States illegally shall be fined or imprisoned for up to 5 years *per alien*. 8 U.S.C. § 1324(a)(1)(A)(iv); 8 U.S.C. § 1324(a)(1)(B)(ii). Such encouragement or inducement can even carry the death penalty when it

7

results in the death of any person. 8 U.S.C. § 1324(a)(1)(B)(iv). Presumably, such a death can occur in a car collision. *See* Snejana Farberov, *Father-Of-Five Who Advocated Rights For Migrants Is Hit And Killed By Illegal Immigrant On Probation For A DUI Who Was Ordered To Be Deported Back To El Salvador Eight Months Ago*, DAILYMAIL.COM, Aug. 9, 2019, https://www.dailymail.co.uk/news/article-7341273/Immigration-advocate-killed-crash-Salvadoran-living-illegally.html.

The Green Light Law requires state employees to commit such encouragement or inducement by providing in-state driving privileges to aliens who lack registration. § 502.1 The Green Light Law even compels New York DMV officials to extend such privileges to aliens whose foreign documents are nearly two years expired. *Id.* Bestowal of a driving privilege on illegal aliens in New York *ipso facto* encourages or induces them to remain in the United States. Indeed, Defendants promise a number of benefits from the Green Light Law that it can only deliver if issuing divers' licenses to illegal aliens induces them to remain in New York in greater numbers than they would otherwise. For example, the Green Light Law will "keep our economy moving," provide "significant economic growth," raise "millions of dollars in revenue," promote a "boom as earnings and spending increase," while "State and private companies [in New York] stand to benefit from increased economic activity . . . ." *Senate Passes Driver's License Access and Privacy Act (Green Light NY)*, N.Y. State Senate (June 17, 2019), https://www.nysenate.gov/newsroom/press-releases/2019/senate-passes-drivers-license-access-and-privacy-act-green-light-ny.

The Green Light Law also bars state officials from preventing, curing, or mitigating the effects of this crime. Specifically, the Green Light Law prohibits DMV employees from disclosing information about the alien to federal immigration authorities, and compels them to

8

disclose to the alien any knowledge he may obtain of investigation of or enforcement against the alien by federal immigration officials. § 201.12.

This scheme directly contradicts federal law.. and makes "compliance with both federal and state regulations […] a physical impossibility." *Fla. Lime*, 373 U.S. at 142–43. Therefore, the Green Light Law is unconstitutional under the Supremacy Clause. *See* U.S. CONST. art. VI, cl. 2.

### B. The Green Light Law directs state employees to commit criminal "shielding" under 8 U.S.C. § 1324(a)(1)(A)(iii).

Any person who "conceals, harbors, or shields from detection" an alien remaining in the United States illegally, or attempts to do so, shall be fined or imprisoned for up to 5 years *per alien*. 8 U.S.C. § 1324(a)(1)(A)(iii). Yet the Green Light Law requires DMV officials to commit such offenses by prohibiting them from disclosing any information about the alien to federal immigration authorities, and requiring them to disclose to the alien any knowledge they may obtain of investigation of or enforcement against the alien by federal immigration officials. In these ways, the Green Light Law patently compels state employees to conceal or shield illegal aliens from detection by federal authorities. Again, because "compliance with both federal and state regulations is a physical impossibility" under the Green Light Law, 373 U.S. at 142–43, the Green Light LAw is unconstitutional under the Supremacy Clause.

### C. The Green Light Law directs state employees to commit human trafficking under 8 U.S.C. § 1324(a)(1)(A)(ii).

Any person who "attempts to transport or move" an alien illegally remaining in the United States shall be fined or imprisoned. 8 U.S.C. § 1324(a)(1)(A)(ii). Granting a driver's license to an illegal alien is a cause of that alien's subsequent transportation and movement in furtherance of his or her continued unlawful presence in the United States. Because the Green

Light Law thus requires state officials to cause the transportation or movement of illegal aliens in furtherance of their continued unlawful presence, it exposes him to criminal liability under § 1324(a)(1)(A)(ii). *See, e.g., United States v. Rodriguez*, 587 F.3d 573 (2d Cir. 2009) (affirming the conviction of defendant who transported an illegal alien by luring her into a vehicle driven by a co-conspirator); *United States v. Alvillar*, 575 F.2d 1316 (10th Cir. 1978) (holding that causing transportation of illegal aliens by chartering a flight for them was offense under 8 U.S.C. § 1324(a)(2), since intent to punish generally persons who cause unlawful act to be done is evident from the language of 18 U.S.C. § 2(b)). Further, the Green Light Law forces DMV employees to facilitate the transportation or movement of illegal aliens anywhere in the United States in which a New York non-federally compliant driver's license is accepted. Thus, again, under the Green Light Law, "compliance with both federal and state regulations is a physical impossibility," 373 U.S. at 142–43, and the Green Light Law is unconstitutional under the Supremacy Clause.

### III.    The Green Light Law is preempted by federal laws that occupy the field of regulating the admission and registration of aliens.

Congress has already regulated the means by which federal, state, and local government agencies may verify the foreign citizenship or immigration status of individuals. But the Green Light Law substitutes its own alien registration scheme for Congress's. The Green Light Law even requires New York officials to make independent judgments scrutinizing foreign-issued passports, a uniquely federal competency and function. Accordingly, the Green Light Law encroaches upon a federally regulated field and is therefore preempted. "[T]he Federal Government has occupied the field of alien registration." *Arizona v. United States*, 567 U.S. 387, 401 (2012).

The Green Light Law requires DMV employees to accept, as a "primary forms of . . . proof of identity . . . a valid, unexpired foreign passport issued by the applicant's country of

10

citizenship" and "a valid, unexpired consular identification document issued by a consulate from the applicant's country of citizenship . . . ." § 502.1.  The Green Light Law's plain language requires state employees to apply an idiosyncratic state standard to (1) determine whether a proffered foreign passport or consular ID card is "valid" and (2) accept that the applicant is a citizen of the foreign country that issued the document in question. The state standard is idiosyncratic because a consular identification card only indicates that the foreign state issuing the card claims the bearer to be its citizen or national for purposes of compliance with the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. These claims are verified by the Department of Homeland Security or the Department of State. *E.g.* 8 U.S.C. § 1373(c). Yet it is just such verification that the Green Light Law forecloses. § 201.12.

Likewise, a foreign passport can only be lawfully "validated" for purposes of ascertaining foreign citizenship—an immigration classification—if the passport has been inspected by a U.S. consulate or U.S. immigration inspector. *See* 8 U.S.C. §§ 1301–1306 (Registration of Aliens); 8 U.S.C. § 1181(a) (describing documents required for admission of immigrants); 8 U.S.C. § 1184(a) (regulations for admission of nonimmigrants); 8 U.S.C. § 1101(a)(3) (defining "alien"). It must contain the visa or entry stamp affixed therein, as evidence of mandatory alien registration. *Id.* The statutory procedure for confirming that an identity or travel document issued by a foreign state is "valid" is entrusted by Congress exclusively to the U.S. Department of Homeland Security or the U.S. Department of State. Accordingly, state and municipal authorities rely upon these agencies when ascertaining the legitimacy of foreign passports in the United States—they do not make the determination on their own. *See, e.g.,* 8 U.S.C. § 1373(c) ("The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local

11

government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency . . . .").

Because the fields of alien admission and alien registration have been completely occupied by the federal government, even complementary or supportive state variations violate the Supremacy Clause—let alone schemes expressly purposed toward thwarting federal law. *Arizona*, 567 U.S. at 401 ("Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible."). By creating a novel state standard, at odds with federal law, for whether a person has the immigration classification of foreign citizenship, and for whether foreign passports or consular identification cards are "valid," the Green Light Law regulates in a field Congress has fully occupied, and accordingly is field preempted. *See, a fortiori, Hines v. Davidowitz*, 312 U.S. 52 (1941) (holding even a Pennsylvania state registration statute that complemented federal law unconstitutional on field preemption grounds).

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied, and Plaintiff's cross-motion for summary judgment should be granted.

DATED: May 2, 2025                          Respectfully submitted,

<u>*s/Christopher J. Hajec*</u>
Christopher J. Hajec
Gabriel R. Canaan
*Attorneys for Amicus Curiae*
Immigration Reform Law Institute
25 Massachusetts Ave. NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590
chajec@irli.org
gcanaan@irli.org